46 A.3d 648

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Michael WILLIS, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 2009.

Decided May 30, 2012.

50

Hugh J. Burns, Jr., Philadelphia, Peter Carr, Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

Mitchell S. Strutin, Strutin & Smarro, for Michael Willis.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION ANNOUNCING THE JUDGMENT OF THE COURT*

Justice TODD.

In this appeal by allowance, the Commonwealth asks us to consider whether the materiality requirement of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), is satisfied where the evidence not disclosed by the Commonwealth would itself not have been admissible at trial. The Commonwealth further requests that we reconsider, based on more recent decisions by this Court and the United States Supreme Court, our holding in *Commonwealth v. Green,* 536 Pa. 599, 640 A.2d 1242 (1994), wherein we held that evidence that is not admissible at trial may, nevertheless, be deemed material. After careful consideration, we hold that nondisclosed favorable evidence which is inadmissible at trial may be considered material for purposes of *Brady,* as long as there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Mere speculation by a defendant, however, will not be sufficient to meet this standard; rather, he must identify specific evidence or information that would have been uncovered, and explain how that evidence or information would have changed the result of the proceeding. Notwithstanding our holding, because we find that Appellee herein did not establish there was a reasonable probability that, had the evidence withheld by the Commonwealth been disclosed, there would have been a different outcome at trial, we reverse the order of the Superior Court remanding for a new trial, and reinstate Appellee's judgment of sentence.

## I.

The relevant facts of the instant case are as follows: At approximately 2:15 a.m. on April 29, 2005, David Thomas was walking along 6th Street in Philadelphia when two men ap-

proached him and pushed him. One of the men pulled a gun from his pocket and pointed it at Thomas' face, telling Thomas "give us your money or we'll blow your head off." N.T. Trial, 10/31/06, at 46–47. Thomas gave the gunman approximately $40, and his assailants then fled. Although it was dark at the time of the incident, Thomas was able to see his assailants by the light of the streetlamps. *Id.* at 45–46, 68.

Approximately one hour later, after returning home, Thomas called the police to report what had happened. When the police arrived at Thomas' home, he initially told them he would be unable to identify the men who robbed him because he was nervous and overwhelmed. Eventually, however, he gave police a description, describing the man with the gun as between 5'9" and 6' tall, with dark skin and a goatee, and wearing a puffy black coat. Thomas described the other man as light-skinned, clean-shaven, and wearing tan pants and a hockey jersey. At approximately 4:15 am., Thomas accompanied the officers to the police station, where he gave a formal statement and description.

Nearly two weeks later, on May 12, 2005, police again went to Thomas' house and showed him a photo array of eight individuals. From the photo array, Thomas identified Michael Willis, Appellee herein, as the gunman who had robbed him. Thereafter, Willis and his accomplice, Richard Peoples, were arrested and charged with robbery[1] and possession of an instrument of crime.[2] On August 17, 2005, Thomas picked Willis out of a line-up, again identifying Willis as one of his attackers. Thomas also identified Willis as the gunman both at his preliminary hearing on August 18, 2005, and at trial.

On November 1, 2006, Willis was convicted by a jury of the aforementioned charges. Prior to sentencing, Willis filed a motion challenging the verdict as against the weight and sufficiency of the evidence. Willis also filed a motion for a new trial on the basis of an alleged *Brady* violation by the Commonwealth. Specifically, Willis alleged that Peoples had

1.  18 Pa.C.S.A. § 3701(a)(1)(ii).
2.  18 Pa.C.S.A. § 907(a).

made a deal with the Commonwealth prior to trial, whereby he agreed to plead guilty to certain unrelated charges in exchange for the Commonwealth's *nolle pros* of certain other charges, including the robbery of Thomas. Willis averred that, in the course of his discussions with police, Peoples indicated that he committed the Thomas robbery with someone other than Willis, namely, a man named Robert Richardson a/k/a Woodard (hereinafter "Woodard"). The statement was inadvertently omitted from documents produced by the Commonwealth prior to trial, and was discovered by the prosecutor in her file following trial. The statement was brought to the trial court's attention, and the court offered to allow the victim to view another photo array containing a photo of Woodard, but Willis' counsel refused.

Peoples was subpoenaed to testify at a hearing on Willis' *Brady* claim, but was not transported from state prison to court because, according to a statement made by the prosecutor to the trial judge at the hearing, Peoples' attorney told the prosecutor that he would advise Peoples to invoke his Fifth Amendment rights and refuse to testify regarding the robbery. Willis' counsel did not object to the prosecutor's statement, nor did she request that Peoples be brought to court to confirm on the record that he would invoke the Fifth Amendment if asked to testify about the robbery.

In his opinion for the trial court, the Honorable Glenn B. Bronson acknowledged that Peoples' statement, which identified someone other than Willis as the person who robbed Thomas, "plainly was exculpatory and should have been provided to the defense." *Commonwealth v. Willis,* CP–51–CR–1000571–2005, unpublished memorandum at 5 (Phila. Cty. filed Sept. 4, 2007). Nevertheless, the trial court concluded that Peoples' statement was not material within the meaning of *Brady* because disclosure of the statement could not have affected the outcome of the case. Specifically, the trial court reasoned that Peoples' out-of-court statement was inadmissible hearsay, and that, based on the prosecutor's statement that Peoples' attorney told her he would advise Peoples not to testify, Peoples' statement would never have been introduced

to the jury. In addition, the trial court noted "the evidence at the hearing established that Woodard did not resemble [Willis], thereby making it improbable that the complaining witness confused [Willis] for Woodard and made a misidentification." *Id.* at 6. Accordingly, on March 16, 2007, the trial court denied Willis' motion for a new trial based on the Commonwealth's alleged *Brady* violation, and sentenced Willis to an aggregate term of 10 to 20 years incarceration.

Following the denial of his post-trial motions, Willis appealed his judgment of sentence to the Superior Court. On May 14, 2008, the Superior Court vacated Willis' judgment of sentence and remanded for a new trial. *Commonwealth v. Willis,* 1024 EDA 2007, unpublished memorandum, 954 A.2d 44 (Pa.Super. filed May 14, 2008). In doing so, the Superior Court relied on this Court's decision in *Commonwealth v. Green, supra,* for the proposition that *Brady* does not require an analysis of the admissibility of evidence before such evidence can be deemed material. Specifically, the Superior Court noted that Peoples' statement "goes directly to the potential innocence of Willis;" that there was no proof that Peoples would have refused to testify; and that, "even if the statement were not admissible, it is not the Commonwealth's role to determine how defense counsel shall use such evidence." *Willis,* 1024 EDA 2007, at 6.

On August 15, 2008, the Commonwealth filed a petition for allowance of appeal, and, on March 18, 2009, this Court granted the Commonwealth's petition with respect to the following issues:

(1) Whether the Superior Court erred in finding that the materiality requirement of *Brady v. Maryland,* 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963), was satisfied where the omitted statement of a codefendant would not have been admissible at trial, and the defendant did not demonstrate that its production to the defense before trial would have led to the discovery of admissible evidence?

(2) Whether this Court should reconsider its holding in *Commonwealth v. Green,* [536 Pa. 599] 640 A.2d 1242 (Pa.

1994), in light of subsequent decisions to the contrary of this Court and the U.S. Supreme Court.

*Commonwealth v. Willis*, 600 Pa. 499, 968 A.2d 224 (2009) (order). In addressing these issues on appeal, we specifically directed the parties to consider the following cases: *Wood v. Bartholomew*, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995); *Commonwealth v. Lambert*, 584 Pa. 461, 884 A.2d 848 (2005); *Commonwealth v. Mitchell*, 576 Pa. 258, 839 A.2d 202 (2003); *Madsen v. Dormire*, 137 F.3d 602 (8th Cir.1998); and *Wright v. Hopper*, 169 F.3d 695 (11th Cir.1999).

## II.

We begin with a discussion of the United States Supreme Court's seminal decision in *Brady*. In that case arising in Maryland, the defendant, Brady, and his companion, Boblit, were tried and convicted at separate trials of first-degree murder. Brady was tried first, and, at trial, he took the stand and admitted his participation in the crime, but claimed that Boblit did the actual killing. After Brady was convicted, sentenced, and his conviction was affirmed on appeal, Brady discovered that, despite his counsel's pre-trial request to examine all of Boblit's extrajudicial statements, one of those statements, in which Boblit admitted to the actual homicide, was withheld by the prosecution. Brady's petition for post-conviction relief was dismissed by the trial court, but the Maryland Court of Appeals reversed and remanded for a retrial on the issue of punishment only. The United States Supreme Court granted *certiorari*, and agreed with the Court of Appeals that the prosecutor's nondisclosure of Boblit's confession violated Brady's due process rights under the Fourteenth Amendment to the United States Constitution, explaining "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194.

More than ten years later, in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), a case arising

out of the District of Columbia, the Supreme Court extended the disclosure obligations of the prosecutor, as set forth in *Brady*, to situations where the prosecutor is in possession of evidence favorable to the accused, but where there has been no specific request for information by defense counsel. The *Agurs* Court held that, although the prosecutor does not have a duty to provide the accused with "unlimited discovery of everything known by the prosecutor," where there are circumstances in which the exculpatory evidence in the possession of the prosecutor may be of significant value to the defense, "elementary fairness requires it to be disclosed even without a specific request." *Id.* at 106, 110, 96 S.Ct. 2392.[3]

Nearly ten years after *Agurs*, in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), a case originating in Washington, the Supreme Court considered whether the prosecution had a duty to disclose evidence which, though not exculpatory, could have been used by the defense to impeach prosecution witnesses. Prior to Bagley's trial on charges that he violated federal narcotics and firearms statutes, his counsel requested that the prosecution disclose any inducements that were made to witnesses that were called by the government. The prosecution failed to disclose that two of its principal witnesses had been promised the possibility of a reward for the information they supplied to investigators. Following his conviction, Bagley filed requests for information

**3.** In a footnote, the *Agurs* Court noted:

It has been argued that the standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence. *See* Note, The Prosecutor's Constitutional Duty to Reveal Evidence to the Defense, 74 Yale L.J. 136 (1964). Such a standard would be unacceptable for determining the materiality of what has been generally recognized as "Brady material" for two reasons. First, that standard would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor's entire case would always be useful in planning the defense. Second, such an approach would primarily involve an analysis of the adequacy of the notice given to the defendant by the State, and it has always been the Court's view that the notice component of due process refers to the charge rather than the evidentiary support for the charge.

427 U.S. at 113 n. 20, 96 S.Ct. 2392.

pursuant to the Freedom of Information Act and the Privacy Act of 1974, and obtained copies of form contracts between the Bureau of Alcohol Tobacco and Firearms and the two principal witnesses. The form contracts, which had been signed by the witnesses, were titled "Contract for Purchase of Information and Payment of Lump Sum Therefor," and contained a type-written description of services [4] that the witnesses were expected to provide in exchange for $300. Bagley moved to have his sentence vacated on the basis that the government's failure to disclose the contracts, which he could have used to impeach the two witnesses, violated his due process rights under *Brady*.

The district court denied Bagley's motion, but the Court of Appeals for the Ninth Circuit reversed, disagreeing with the district court's conclusion that the failure to disclose was harmless beyond a reasonable doubt, and holding the government's failure to disclose the requested impeachment evidence required automatic reversal. Following grant of *certiorari*, the Supreme Court reversed, ruling that the prosecution has an obligation to disclose impeachment evidence as well as exculpatory evidence, as this evidence is "evidence favorable to the accused" under *Brady. Bagley*, 473 U.S. at 676, 105 S.Ct. 3375. The Court further explained in *Bagley* that, regardless of the specificity of a defendant's request for evidence,[5] evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the

4. The description read as follows:
   "That he will provide information regarding T–I and other violations committed by Hughes A. Bagley, Jr.; that he will purchase evidence for ATF; that he will cut [*sic*] in an undercover capacity for ATF; that he will assist ATF in gathering of evidence and testify against violator in federal court."
   *Bagley*, 473 U.S. at 671, 105 S.Ct. 3375.

5. "We find the *Strickland* formulation of the *Agurs* test for materiality sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375.

outcome." *Id.* at 682, 105 S.Ct. 3375 [6]; *see also Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Smith v. Cain,* —— U.S. ——, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012).

In 1995, in *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), a case arising in Louisiana, the Supreme Court further extended the requirements of *Brady* by holding that a "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 437, 115 S.Ct. 1555. The high Court reiterated, however, that evidence is material under *Brady,* and the failure to disclose it justifies setting aside a conviction, only where there exists a reasonable probability that, had the evidence been disclosed, the result at trial would have been different. *Id.* at 434, 115 S.Ct. 1555.

Approximately six months after its decision in *Kyles v. Whitley,* the Supreme Court issued a *per curiam* decision in *Wood v. Bartholomew,* 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995), another case that arose out of Washington. In *Wood,* respondent Dwayne Earl Bartholomew robbed a laundromat, shooting and killing the attendant in the process. Bartholomew admitted that he committed the robbery and that the shots that killed the attendant came from his gun; the sole issue at trial was whether he was guilty of aggravated first-degree murder, which required proof of premeditation, or of felony murder, which required no such proof. Part of the prosecution's evidence consisted of statements made by Bartholomew's brother, Rodney, and Rodney's girlfriend, Tracy Domandy, both of whom testified that they saw Rodney sitting in his car outside the laundromat on the day of the killing. Rodney testified that his brother told him that he intended to rob the laundromat and "leave no witnesses." *Id.* at 3, 116 S.Ct. 7. Tracy testified that, shortly after the robbery, Bartho-

---

**6.** As discussed in more detail *infra, Bagley* was a fractured opinion, and only certain portions of the majority opinion garnered a majority holding. Nevertheless, a majority of the Justices expressly joined the majority's holding that evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

lomew arrived at their house, claiming, "he had put two bullets in the [attendant's] head." *Id.* Bartholomew testified in his own defense, admitting that he threatened the victim with a gun, but claiming that the gun discharged accidentally. He denied telling his brother or Tracy that he intended to leave no witnesses, and claimed that Rodney had assisted in the robbery by convincing the attendant to open the laundromat's door after it had closed for the night.

Following his conviction for aggravated first-degree murder, and after exhausting his state remedies, Bartholomew filed a *habeas* petition raising, *inter alia,* a *Brady* claim based on the prosecution's failure to produce the results of pre-trial polygraph examinations of Rodney and Tracy. Specifically, when asked whether he had assisted his brother in the robbery, or whether he and his brother were, at any time, in the laundromat together, Rodney answered in the negative; the examiner, however, concluded that Rodney's answers suggested deception. The district court denied relief; however, the Ninth Circuit reversed. While noting that polygraph examinations are inadmissible as evidence under Washington law, even for impeachment purposes, the court concluded that the results were, nevertheless, material under *Brady,* in that, had Bartholomew's counsel known of the polygraph results, "he would have had a stronger reason to pursue an investigation of Rodney's story," and "likely would have taken Rodney's deposition." *Bartholomew v. Wood,* 34 F.3d 870, 875 (9th Cir. 1994). The court further opined that, at such deposition, Bartholomew's counsel "could have asked Rodney about the polygraph results and might well have succeeded in obtaining an admission that he was lying about his participation in the crime" and "would likely have uncovered a variety of conflicting statements which could have been used quite effectively in cross-examination at trial." *Id.* at 875–76.

On appeal, the United States Supreme Court reversed. Citing *Kyles v. Whitley,* the Court stated:

[A]s we reiterated just last Term, evidence is "material" under *Brady,* and the failure to disclose it justifies setting aside a conviction, only where there exists a "reasonable

probability" that had the evidence been disclosed the result at trial would have been different. To begin with, on the Court of Appeals' own assumption, the polygraph results were inadmissible under state law, even for impeachment purposes, absent a stipulation by the parties, and the parties do not contend otherwise. The information at issue here, then—the results of a polygraph examination of one of the witnesses—is not "evidence" at all. Disclosure of the polygraph results, then, could have had no direct effect on the outcome of trial, because respondent could have made no mention of them either during argument or while questioning witnesses. To get around this problem, the Ninth Circuit reasoned that the information, had it been disclosed to the defense, might have led respondent's counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized. Other than expressing a belief that in a deposition Rodney might have confessed to his involvement in the initial stages of the crime—a confession that itself would have been in no way inconsistent with respondent's guilt—the Court of Appeals did not specify what particular evidence it had in mind. Its judgment is based on mere speculation, in violation of the standards we have established.

*Wood,* 516 U.S. at 5–6, 116 S.Ct. 7 (citations omitted).

In interpreting the federal precedent discussed above, this Court has explained that, in order to establish a *Brady* violation, a defendant must show that: (1) evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence was favorable to the defendant, either because it was exculpatory or because it could have been used for impeachment; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. *See Commonwealth v. Lambert,* 584 Pa. 461, 471, 884 A.2d 848, 854 (2005); *Commonwealth v. Collins,* 585 Pa. 45, 68, 888 A.2d 564, 577–78 (2005). However, "[t]he mere possibility that an item of undisclosed information *might* have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Common-*

*wealth v. Chambers*, 570 Pa. 3, 29, 807 A.2d 872, 887 (2002) (citation omitted and emphasis added). Rather, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 29, 807 A.2d at 887–88 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375).

In urging this Court to reverse the Superior Court's decision herein to award Willis a new trial based on the Commonwealth's alleged violation of *Brady*, the Commonwealth first contends that Peoples' statement does not satisfy the materiality requirement originally established by the United States Supreme Court in *Brady*, modified by the Supreme Court in *Wood*, and ultimately adopted by this Court in *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003), because Peoples' statement was not against his penal interest, and thus constituted inadmissible hearsay. Commonwealth's Brief at 9 (citing *Commonwealth v. Brinkley*, 505 Pa. 442, 453, 480 A.2d 980, 986 (1984) (any portions of an out-of-court declarant's statement about others' involvement or lack of involvement in a particular crime are neither inculpatory, nor declarations against penal interest)). With respect to the Superior Court's reliance on this Court's decision in *Green* for the proposition that evidence need not be admissible in order to be considered material for *Brady* purposes, the Commonwealth maintains that "*Green* has not represented a colorable statement of the law on this point for at least fourteen years." Commonwealth's Brief at 11. The Commonwealth further avers that "[d]ecisions of both the United States and Pennsylvania Supreme Courts subsequent to *Green* have clarified that inadmissible evidence will not be deemed material under *Brady*, at least where there is no showing that it would have led to the discovery of admissible evidence." Commonwealth's Brief at 11. To the extent *Green* suggests that such a showing is unnecessary under *Brady*, the Commonwealth asks that we reconsider *Green*. Commonwealth's Brief at 18.

The Commonwealth further asserts that Willis failed to demonstrate that the prosecution's timely disclosure of Peoples' statement would have led to the discovery of admissible evidence that would have been reasonably likely to alter the outcome of the trial. *Id.* at 13. Finally, the Commonwealth contends that the Superior Court's "remaining justifications" for its decision, including, *inter alia,* its opinion that Peoples' statement would have added weight to certain facts raised by the defense, and that the Commonwealth's actions were dishonest, are irrelevant and improper under *Wood.* Commonwealth's Brief at 14–17.

Willis, conversely, contends that the Superior Court's decision to grant him a new trial based on the prosecution's untimely disclosure of Peoples' statement was proper under this Court's decision in *Green,* irrespective of whether the statement constituted inadmissible hearsay and regardless of any failure to demonstrate that timely disclosure of the statement would have led to the discovery of admissible evidence. According to Willis, *Green* represents a correct statement of the law, which should remain undisturbed. Willis further argues that, notwithstanding *Green,* he "sustained his burden of demonstrating that the more prompt disclosure of Peoples' statement would have led to admissible evidence that would have been reasonably likely to alter the outcome of the trial." Appellee's Brief at 18.

## III.

### A.

We first consider the Commonwealth's argument that *Green* no longer represents a correct statement of the law, and, therefore, should be expressly overruled by this Court. In doing so, we also consider Chief Justice Castille's position, as expressed in his Concurring Opinion, that *Green* was never a correct statement of the law.

This Court issued its unanimous decision in *Green* in 1994, one year prior to the United States Supreme Court's *per curiam* decision in *Wood.* In that case, Samuel Lee Green was

alleged to have entered the Harrisburg, Pennsylvania apartment of the victim, a police officer, through a window, and stolen the victim's car keys. Green then drove the stolen car to Bonnie Sue Pflugler's house, and the two then drove back to the victim's apartment, ostensibly for the purpose of committing another burglary. Once in the apartment, the pair stole several items, including the victim's .357–Magnum service revolver, and then either forced the victim into the trunk of his car and later shot him, or placed the victim in the trunk after shooting him twice in the head. Green and Pflugler drove to a secluded area known as the 27th Street Extension, removed the victim from the trunk, and buried his nude body under a pile of brush. They then fled, first to Virginia, where they abandoned the victim's car; then to North Carolina, where they stole a van; and finally to Florida, where they were arrested.

Following his arrest, Green gave various statements regarding his and Pflugler's activities on the night the victim was murdered. In each statement, Green maintained that he was not with Pflugler when the victim was taken from the apartment; that he saw Pflugler and the victim standing by the trunk of the victim's car; and that once he and Pflugler stopped in the area of the 27th Street Extension, he walked away from the car and heard two shots. Green and Pflugler were tried separately. Green, who was tried first, was convicted of first-degree murder, kidnapping, and conspiracy, and thereafter was sentenced to death.[7] Green filed post-trial motions wherein he argued the Commonwealth violated *Brady* by failing to disclose certain exculpatory evidence prior to trial, notwithstanding his pretrial request for all favorable or exculpatory statements in the Commonwealth's possession. Specifically, Green alleged that the prosecution failed to disclose a statement made by Thomas Moser to an investigating officer, wherein Moser recalled encountering Pflugler in a bar sometime after the murder. According to Moser, Pflugler told him that "she did something really big; that she could sit

---

7. On the second day of Pflugler's trial, she pled guilty to third-degree murder, kidnapping, and conspiracy.

big time for it; that she shot someone; and that she killed a cop." *Green,* 536 Pa. at 603, 640 A.2d at 1244. Green became aware of Moser's statement only after Moser was called to testify for the Commonwealth at Pflugler's trial. The trial court found that Moser's statements were neither admissible nor exculpatory, and rejected Green's *Brady* claim.

On appeal of his judgment of sentence, Green argued that the trial court erred in rejecting his *Brady* claim, and this Court agreed, explaining:

> Recently, in *Commonwealth v. Moose,* 529 Pa. 218, 602 A.2d 1265 (1992), this Court discussed in detail the holding in *Brady* and its progeny. As we noted there, materiality is determined by different standards depending upon whether trial counsel made a specific or a general request for exculpatory evidence. For instance, where the defense gives the prosecution notice of exactly what the defense desires, the test of materiality is whether the evidence might have affected the outcome of the trial. *Commonwealth v. Moose,* 529 Pa. at 233, 602 A.2d at 1272, *quoting United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342, 350 (1976). Where, as here, a general, as opposed to specific, request for exculpatory evidence is made, the evidence is material "if the omitted evidence creates a reasonable doubt that did not otherwise exist ..." *Moose,* 529 Pa. at 233, 602 A.2d at 1272, *quoting Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355. The Court in *Agurs* further stated that
>
>> the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.
>
> *Agurs,* 427 U.S. at 112–113, 96 S.Ct. at 2402, 49 L.Ed.2d at 355. *In determining the materiality of the omitted evidence we must, therefore, consider any adverse effect that the prosecutor's failure to disclose might have had on not*

*only the presentation of the defense at trial, but the prepa-*
*ration of the defense as well. See, United States v. Bagley,*
473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Upon
application of these principles to the facts of the instant
case, we conclude that the evidence withheld by the Com-
monwealth is relevant and material.

*Green,* 536 Pa. at 604–05, 640 A.2d at 1244–45 (emphasis
added).

We then determined:

A review of the record thus, evinces the relevancy and
materiality of the omitted evidence at the guilt phase.
First, Moser's statements to the police in no way implicated
appellant in the murder. Instead, they implicated only
Pflugler. Moreover, knowledge of Pflugler's statement to
Moser certainly would have opened another avenue of inves-
tigation for the defense that may well have led to further
exculpatory evidence. Had the defense been aware of
Moser's statements, it may also have altered its trial strate-
gy, especially in regards to appellant's decision not to testify
since Moser's statements were consistent with appellant's
own statements to the police.

The omitted evidence was also clearly relevant and material
to the issue of appellant's punishment. It is beyond perad-
venture that the statements of Moser would have provided
the defense with strong evidence of mitigation. During the
penalty phase, the Commonwealth incorporated all other
evidence from [the] guilt phase and argued therefrom that
the evidence showed that appellant alone shot Officer Bow-
ser twice in the head and that appellant alone transported
Officer Bowser in the trunk of his car to a secluded area and
executed him. Again, the Commonwealth argued this with-
out any direct evidence in support thereof.

*Green,* 536 Pa. at 606, 640 A.2d at 1245–46.

We further rejected in *Green* the trial court's conclusion
that Moser's statement was not material under *Brady* because
it was inadmissible hearsay, which did not qualify under the
exception of a declaration against penal interest because it was

not given under reliable circumstances. Indeed, we held that *Brady* does not require that nondisclosed evidence be admissible before it can be deemed material, stating:

> In *Brady*, as here, the evidence withheld by the prosecution was a statement made by the co-defendant admitting the actual homicide. Contrary to the statement at issue here, however, the undisclosed confession in *Brady* clearly implicated Brady as also wanting to kill the victim. Specifically, the undisclosed confession contained statements to the effect that while both Brady and his co-defendant wanted to kill the victim, they disagreed on the manner for so doing. Because Brady had admitted his participation in the murder, claiming only that he did not do the actual shooting, the Court there correctly held that the omitted evidence would not have reduced Brady's offense below first degree murder since that evidence did not absolve the defendant of criminal liability for the murder and was, therefore, significant only as to the punishment of Brady. Thus, it is clear that the holding in *Brady* as to the admissibility of the evidence was based solely on the precise facts of that case and in no way mandates that the evidence first be admissible before it can be deemed "material" to the defense.

*Id.* at 607, 640 A.2d at 1246.[8]

Prior to addressing the Commonwealth's contention that Green is *no longer* a correct statement of the law, we note that Chief Justice Castille, in his Concurring Opinion, suggests that *Green* was wrongly decided in the first instance because it misinterpreted federal law with respect to whether materiality under *Brady* extends to effects on trial preparation. Concurring Opinion at 91, 46 A.3d at 675. According to the Chief Justice, it is unclear what United States Supreme Court

---

8. In *Green*, we also concluded that the Commonwealth's failure to disclose Moser's statement to the defense constituted a violation of former Pa.R.Crim.P. 305(B)(1)(a), which was promulgated in response to the dictates of *Brady*, and which requires the Commonwealth to provide, upon request by the defendant, any evidence favorable to the accused which is material either to guilt or to punishment, provided the evidence is material to the case. Rule 305 was renumbered Rule 573 effective April 1, 2001.

authority—*Agurs* or *Bagley*—the *Green* Court relied upon for its conclusion that *Brady* materiality applies to trial preparation. Moreover, the Chief Justice opines that neither *Agurs*, nor *Bagley*, support the *Green* Court's conclusion in this regard.

The Chief Justice initially opines that the *Green* Court's use of the term "therefore" to preface its holding that a court should consider any adverse effect nondisclosure had on the preparation and presentation of the defense at trial suggests the *Green* Court was relying on *Agurs* in support of its holding. Concurring Opinion at 93, 46 A.3d at 676. While there is admittedly some ambiguity in this regard, we conclude, based upon our above discussion of *Agurs*, that it is more likely the *Green* Court's holding was based on *Bagley*. Indeed, as noted by the Chief Justice, in *Agurs*, the Supreme Court rejected the argument that "the standard [for assessing *Brady* materiality] should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence." Concurring Opinion at 95, 46 A.3d at 677 (citing *Agurs*, 427 U.S. at 112 n. 20, 96 S.Ct. 2392). We are inclined to presume the confusion highlighted by the Chief Justice in this regard was the result of an inadvertently misplaced adverb by the *Green* Court, and not a deliberate misrepresentation of the law.

Nevertheless, even accepting that the *Green* Court was relying on *Bagley*, Chief Justice Castille suggests that *Bagley* does not support *Green's* holding, noting that Justice Blackmun's opinion in *Bagley* was divided into three Sections; the first outlined the factual and procedural history, the second disapproved the automatic reversal rule for *Brady* violations in favor of a test which focused on whether the error is material in the sense the suppression of evidence undermined the confidence in the trial, and the third discussed the concept of materiality. Sections 1 and 2 were joined by Chief Justice Burger and Justices O'Connor, White and Rehnquist, thus garnering a majority. Section 3, however, was joined only by Justice O'Connor. Justice White wrote a concurrence that was joined by the Chief Justice and Justice Rehnquist, and

Justices Brennan, Marshall and Stevens dissented.[9]   Chief
Justice Castille concludes:

> The *Green* Court's citation to *Bagley* apparently intended
> to refer to Section III of Justice Blackmun's opinion, with-
> out recognizing that the expression represented the view of
> but two Justices.   In addition, *Green* failed to recognize that
> this *dictum* spoke to a very specific sub-class of *Brady*
> claims.   And, finally, *Green* mischaracterized the *dictum,*
> taking a **permissive** qualifier—courts **may** consider the
> effect on trial preparation—and reading it as mandatory.

Concurring Opinion at 102, 46 A.3d at 681 (emphasis original).

We recognize that *Green's* citation to *Bagley* was a general,
not a pinpoint, cite, and, moreover, that *Green's* citation to
*Bagley* arguably suggested that its result was dictated by the
holding of a majority in *Bagley.*   That said, we do not believe
this Court's holding in *Green* was inconsistent with *Bagley,* or
that the concurring or dissenting opinions in *Bagley* precluded
*Green's* extension of *Brady* materiality to consideration of trial
preparation by the defense.   In discussing the standard for
determining materiality in Section III of the opinion in *Bag-
ley,* Justice Blackmun stated:

> The Government suggests that a materiality standard
> more favorable to the defendant reasonably might be
> adopted in specific request cases. . . .   The Government
> notes that an incomplete response to a specific request not
> only deprives the defense of certain evidence, but also has
> the effect of representing to the defense that the evidence
> does not exist.   In reliance on this misleading representa-
> tion, the defense might abandon lines of independent inves-
> tigation, defenses, or trial strategies that it otherwise would
> have pursued. . . .

> We agree that the prosecutor's failure to respond fully to
> a *Brady* request may impair the adversary process in this
> manner.   And the more specifically the defense requests
> certain evidence, thus putting the prosecutor on notice of its
> value, the more reasonable it is for the defense to assume

---

**9.**   Justice Marshall authored a dissent, which was joined by Justice
Brennan; Justice Stevens authored a separate dissent.

from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption. *This possibility of impairment does not necessitate a different standard of materiality, however, for under the Strickland formulation the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.* The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*Id.* at 682–83, 105 S.Ct. 3375 (emphasis added).

In his short concurrence, Justice White agreed that evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, a fact that Bagley failed to establish. In addition, Justice White agreed with Justice Blackmun that the *Strickland* standard—which Justice Blackmun opined would allow a reviewing court to consider any adverse effect a prosecutor's failure to disclose might have had on the preparation or presentation of the defendant's case—was sufficiently flexible to cover all instances of prosecutorial failure to disclose evidence favorable to the accused. Thus, although Justice White saw "no reason to attempt to elaborate on the relevance to the inquiry of the specificity of the defense's request for disclosure, either generally or with respect to this case," 473 U.S. at 685, 105 S.Ct. 3375 (White, J., concurring in part and concurring in judgment), and thus did not join Section III, he expressed no discomfort with Justice Blackmun's suggestion that, under *Strickland,* a determination of *Brady* materiality may include consideration of any adverse effects on trial preparation resulting from nondisclosure.

Justice Marshall, in a dissent joined by Justice Brennan, concluded that the nondisclosure of evidence in *Bagley* "could

not have been harmless," 473 U.S. at 709, 105 S.Ct. 3375 (Marshall, J. dissenting), and would have affirmed the decision of the Court of Appeals. Justice Marshall repeatedly recognized that the state's withholding of available evidence may affect a defendant's strategy at trial. *See* 473 U.S. at 702–03, 105 S.Ct. 3375 ("I would return to the original theory and promise of *Brady* and reassert the duty of the prosecutor to disclose all evidence in his files that might reasonably be considered favorable to the defendant's case. No prosecutor can know prior to trial whether such evidence *will* be of consequence at trial; the mere fact that it might be, however, suffices to mandate disclosure." (emphasis original)); 473 U.S. at 707, 105 S.Ct. 3375 ("Without doubt, defense counsel develops his trial strategy based on the available evidence. A missing piece of information may well preclude the attorney from pursuing a strategy that potentially would be effective. His client might consequently be convicted even though nondisclosed information might have offered an additional or alternative defense, if not pure exculpation."). Thus, the dissenters' position is entirely consistent with Justice Blackmun's suggestion that a state's failure to disclose favorable evidence may adversely affect a defendant's trial preparation or trial strategy.

Accordingly, while one might argue that this Court failed to adequately set forth the support for our decision in *Green,* upon review, we do not agree that *Green* is inconsistent with or unsupported by the United States Supreme Court's decision in *Bagley.* Indeed, the Court of Appeals for the Third Circuit has repeatedly cited *Bagley* for the proposition that, in determining the materiality of evidence under *Brady,* the effect of the nondisclosure on the defense's trial preparation is a relevant consideration. For example, in *United States v. Perdomo,* 929 F.2d 967 (3rd Cir.1991), the court stated:

The Supreme Court has explained that "implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs,* [427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ]; *accord United States v. Bagley,* [473

U.S. 667, 674–75, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ] (plurality opinion). A defendant is entitled to a new trial where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is [defined as] a probability sufficient to undermine confidence in the outcome." *Bagley*, [473 U.S. at 682, 105 S.Ct. 3375]. This court has recognized that the *Bagley* inquiry requires consideration of the totality of the circumstances, including possible effects of non-disclosure on the defense's trial preparation. *Gov't of Virgin Islands v. Martinez*, 780 F.2d 302, 306 (3d Cir.1985) (quoting *Bagley*, [473 U.S. at 683, 105 S.Ct. 3375]).

*Perdomo*, 929 F.2d at 971.[10]

More recently, in *Maynard v. Government of the Virgin Islands*, 392 Fed.Appx. 105, 2010 WL 3330193 (3rd Cir. August 25, 2010), the Third Circuit, in discussing the requirements of a successful *Brady* challenge, stated:

**10.** Likewise, we note that the high courts of several of our sister states have cited *Bagley*—albeit citations to the section of *Bagley* which did not garner an express majority—for the proposition that, in determining materiality for purposes of *Brady*, a court should consider any adverse effect the nondisclosure of evidence may have had on preparation or presentation of the defendant's case. *See, e.g., Floyd v. State*, 902 So.2d 775, 783 (Fla.2005) (per curiam) ("courts should consider not only how the States suppression of favorable information deprived the defendant of direct relevant evidence but also how it handicapped the defendant's ability to investigate or present other aspects of the case." (citing *Bagley*, 473 U.S. at 683, 105 S.Ct. 3375)); *Lawson v. State*, 242 P.3d 993, 1000 (Wyo.2010) ("When the defense makes a specific request and the prosecution fails to respond fully, the reviewing court may consider directly any adverse effect the failure to respond might have had on the preparation or presentation of the defendant's case." (citing *Bagley*, 473 U.S. at 683, 105 S.Ct. 3375)); *In re Steele*, 32 Cal.4th 682, 10 Cal.Rptr.3d 536, 85 P.3d 444, 455 (2004) ("in determining whether evidence was material, 'the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case' " (quoting *Bagley*, 473 U.S. at 683, 105 S.Ct. 3375)); *Walker v. Johnson*, 282 Ga. 168, 646 S.E.2d 44, 47 (2007) (concluding state's incomplete response to discovery motions induced defense counsel to believe that evidence did not exist or that it was not beneficial to the defense (quoting *Bagley*, 473 U.S. at 682–83, 105 S.Ct. 3375)).

> [T]he Supreme Court has suggested that a defendant may predicate a *Brady* claim upon prosecutorial suppression that causes the defendant to "abandon lines of independent investigation, defenses, or trial strategies that [he] otherwise would have pursued," *Bagley,* 473 U.S. at 683, 105 S.Ct. 3375, provided that the defendant shows that he would have discovered admissible evidence which calls the outcome of the trial into question. *Id.* at 684, 105 S.Ct. 3375.

*Maynard,* 392 Fed.Appx. at 115. Similarly, in *Robinson v. Cain,* 510 F.Supp.2d 399 (E.D.La.2007), the United States District Court for the Eastern District of Louisiana recognized that the Fifth Circuit has suggested that inadmissible evidence may be material under *Brady* if it was "material to the preparation of a petitioner's defense." *Id.* at 412 (quoting *Sellers v. Estelle,* 651 F.2d 1074, 1077 n. 6 (5th Cir.1981)).

Finally, with respect to the observation of the Chief Justice that, to the extent *Bagley* held that courts *may* consider the effect of nondisclosure on the defense's preparation for trial, *Green* improperly read that holding as *requiring* a court to consider the same, we concede this is a valid point. We cannot conclude, however, that *Green's* misstatement in this regard compels a conclusion that *Green* "did not square with *Brady* and its progeny on the day it was decided." Concurring Opinion at 102, 46 A.3d at 681.

We now turn to the specific arguments of the Commonwealth in this case regarding the trial court's decision to grant Willis a new trial based on the Commonwealth's alleged violation of *Brady.* In support of its argument that the trial court erred in relying on this Court's decision in *Green* for the proposition that evidence need not be admissible in order to be considered material for *Brady* purposes, the Commonwealth avers: "the United States Supreme Court [in *Wood*] clarified that admissibility is indeed a prerequisite to materiality under *Brady.*" Commonwealth's Brief at 11.[11] We find this to be an

---

11. Throughout its brief to this Court, the Commonwealth makes conflicting statements as to the proper interpretation of *Wood.* For example, on page 11 of its brief, the Commonwealth asserts that, under *Wood,* "admissibility is ... a prerequisite to materiality under *Brady.*"

overly broad interpretation of *Wood.* While the Supreme Court noted in *Wood* that the polygraph results at issue were inadmissible, and, thus, were "not 'evidence' at all," 516 U.S. at 6, 116 S.Ct. 7, the Court did not expressly hold that nondisclosed information, which would have been inadmissible at trial, could not be considered material under *Brady. See, e.g., Felder v. Johnson,* 180 F.3d 206, 212 n. 7 (5th Cir.1999) (the Supreme Court in *Wood* "did not declare squarely whether inadmissible information could be material evidence under *Brady* "); *Paradis v. Arave,* 240 F.3d 1169, 1178 (9th Cir.2001) (the Supreme Court in *Wood* "did not categorically reject the suggestion that inadmissible evidence can be material under *Brady,* if it could have led to the discovery of admissible evidence"); *Wright v. Hopper,* 169 F.3d 695, 704 n. 1 (11th Cir.1999) (the Supreme Court in *Wood* "did not declare that admissibility was a precondition to materiality"); *People v.*

Commonwealth's Brief at 11. The Commonwealth further states "[s]ince *Wood,* this Court has likewise held that, contrary to [our] earlier suggestion in *Green,* inadmissible evidence is not material under *Brady.*" Commonwealth's Brief at 12. In other portions of its brief, the Commonwealth adopts a more qualified position, stating "[d]ecisions of both the United States and Pennsylvania Supreme Courts subsequent to *Green* have clarified that inadmissible evidence will not be deemed material under *Brady, at least where there is no showing that it would have led to the discovery of admissible evidence.*" Commonwealth's Brief at 11 (emphasis added); *see also* Commonwealth's Brief at 13 ("[T]he vast majority of other jurisdictions have held that information cannot meet the *Brady* materiality standard where it is inadmissible *and the defendant makes no showing that it would have led to the discovery of admissible evidence.*" (emphasis added)). Notwithstanding the fact that the Commonwealth is inconsistent in its characterization of the Supreme Court's decision in *Wood,* in its reply brief, the Commonwealth takes Willis to task for pointing out such inconsistencies, claiming, *inter alia,* "[t]he Commonwealth has not argued that inadmissible evidence can *never* qualify as *Brady* material." Commonwealth's Reply Brief at 4 (emphasis original). The Commonwealth, in its reply brief, goes so far as to urge this Court to "adopt the (apparently unopposed) rule that, to satisfy *Brady's* materiality standard, a defendant must show that the suppressed information was admissible or would have led to the discovery of admissible information." *Id.* at 5. As the Commonwealth seemingly concedes that nondisclosed evidence which itself is inadmissible at trial may still be material under *Brady,* if such evidence would have led to the discovery of admissible information, we question the Commonwealth's reason for urging this Court to reconsider that portion of our holding in *Green.*

*Hoyos,* 41 Cal.4th 872, 63 Cal.Rptr.3d 1, 162 P.3d 528, 562 n. 28 (2007) (*"Wood* was not based on a *per se* rejection of inadmissible evidence as a basis for a *Brady* claim."). *But see United States v. Perez,* 280 F.3d 318, 349 (3rd Cir.2002) (without opining as to the reasonableness of such approach, the court noted that the district court's determination that the suppressed evidence was not material under *Brady* because it would have been inadmissible at trial was supported by Supreme Court's decision in *Wood* ). Rather, in holding that the court of appeals improperly found that the results of the polygraph examinations, which were inadmissible at trial, were material under *Brady,* the Supreme Court in *Wood* contemplated:

> To get around this problem [of inadmissibility], the Ninth Circuit reasoned that the information, had it been disclosed to the defense, might have led respondent's counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized.... [T]he Court of Appeals did not specify what particular evidence it had in mind. Its judgment is based on mere speculation, in violation of the standards we have established.

*Wood,* 516 U.S. at 6, 116 S.Ct. 7.

Indeed, the absence of an explicit holding by the Court in *Wood* that inadmissible evidence can never be considered material for *Brady* purposes is evidenced by the fact that, since *Wood,* state and federal courts have developed different approaches with regard to this issue. For example, the Fourth Circuit, in a minority approach, has held that information that is not admissible at trial is, as a matter of law, immaterial under *Brady,* even if it might lead to the discovery of admissible exculpatory evidence. *See Hoke v. Netherland,* 92 F.3d 1350, 1355 (4th Cir.1996) ("We are at a loss to understand how [statements inadmissible at trial] could even possibly be considered 'material.' ").

The remaining circuits, however, have adopted a less restrictive approach. The First, Second, Sixth, and Eleventh Circuits have determined that inadmissible evidence may be considered material under *Brady,* provided disclosure of the

inadmissible evidence would have led to material admissible evidence. *See, e.g., Ellsworth v. Warden,* 333 F.3d 1, 5 (1st Cir.2003) ("given the policy underlying *Brady,* we think it plain that evidence itself inadmissible *could* be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it. *Wood* . . . implicitly assumes this is so." (emphasis original)); *United States v. Gil,* 297 F.3d 93, 104 (2nd Cir.2002) (evidence that is inadmissible at trial may be material under *Brady* if, *inter alia,* it "could lead to admissible evidence"); *United States v. Phillip,* 948 F.2d 241, 249–50 (6th Cir.1991) (information withheld by the prosecution, even if inadmissible at trial, is material for *Brady* purposes if it "would lead directly to . . . evidence admissible at trial for either substantive or impeachment purposes"); and *Wright v. Hopper,* 169 F.3d at 703 (holding that "[i]nadmissible evidence may be material if the evidence would have led to admissible evidence").[12]

Finally, the Fifth, Seventh, and Eighth Circuits have held that a *Brady* violation occurs whenever there is a reasonable probability that the outcome of the trial would have been different if the information had been disclosed. *See, e.g., United States v. Sipe,* 388 F.3d 471, 478 (5th Cir.2004) ("The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state."); *United States v. Asher,* 178 F.3d 486, 496 (7th Cir.1999) (district court did not err in denying appellant's motion for a new trial based on *Brady* violation where there was no reasonable probability that the disclosure of the suppressed information would have affected the outcome of the trial); *Madsen v. Dormire,* 137 F.3d 602, 604–05 (8th Cir.1998)

12. The Ninth Circuit, in *Paradis v. Arave, supra,* recognized not only the lack of a uniform approach in the federal courts as to the treatment of inadmissible evidence as the basis for *Brady* claims, but also the fact that the Ninth Circuit's law on the issue was "not entirely consistent." 240 F.3d at 1179 (comparing *Coleman v. Calderon,* 150 F.3d 1105, 1116 (9th Cir.1998) ("To be material, evidence must be admissible or must lead to admissible evidence.") with *United States v. Sarno,* 73 F.3d 1470, 1505 (9th Cir.1995) (stating that nondisclosure of inadmissible evidence does not give rise to a *Brady* violation)). Nevertheless, the court concluded that the case before it did not require resolution of the conflict.

(prosecutor who failed to disclose information about the incompetency of a nontestifying forensic chemist who performed serology tests on blood-stained items seized from a rape suspect's home did not violate *Brady* because evidence of the chemist's incompetency was not "evidence," as the information could not have been used to impeach the testimony of the victim or the investigating officer regarding blood-stained items, and, "even assuming that information about [the chemist's] incompetency could be considered evidence, the information would not be material because '[t]here simply was no showing to indicate a reasonable probability that disclosure of [the information] would have changed the outcome of the trial'"). Under this latter approach, whether or not the nondisclosed evidence was admissible at trial, or even would have led to the discovery of admissible evidence, is not determinative. Rather, the focus appears to be on whether the disclosure of the evidence would have "put the whole case in such a different light as to undermine confidence in the verdict." *Asher*, 178 F.3d at 496 (quoting *Kyles v. Whitley*, 514 U.S. at 435, 115 S.Ct. 1555).

In our view, this latter approach contemplates that the discovery, and presumably the presentation at trial, of admissible exculpatory evidence is but one basis upon which to find there was a reasonable probability that disclosure would have changed the outcome at trial. Unlike the approach taken by the First, Second, Sixth, and Eleventh circuits, however, it accounts for situations where disclosure of the inadmissible evidence may not have led to the discovery of admissible exculpatory evidence, but would have impacted a defendant's preparation for trial or presentation of his defense to the extent that there is a reasonable probability that the outcome of the trial would have been different had the information been disclosed. *Accord Green*, 536 Pa. at 605, 640 A.2d at 1245 (in determining materiality under *Brady*, we must "consider any adverse effect that the prosecutor's failure to disclose might have had on not only the presentation of the defense at trial, but the preparation of the defense as well").

The Third Circuit has not taken a definitive position on whether, and under what circumstances, nondisclosed evidence which is inadmissible at trial may form the basis of a *Brady* violation. However, the Third Circuit's decision in *United States v. Perez, supra,* suggests, at a minimum, that inadmissibility at trial does not preclude evidence from being considered material under *Brady,* and, moreover, that nondisclosed inadmissible information may be considered material if there is reasonable probability that disclosure would have changed the outcome at trial. In *Perez,* the appellant was convicted of, *inter alia,* conspiracy to distribute methamphetamine. She alleged on appeal that the prosecution violated *Brady* by failing to timely disclose a statement by the conspiracy's ringleader that implicated another co-conspirator and exculpated the appellant. The appellant averred that the evidence was material because it could have been used by the defense to contradict the prosecution's theory of the case. The district court rejected the appellant's claim on the basis that the ringleader's testimony, even if credible, would not have made a difference in the trial because "it could not come in for substantive consideration by the jury because it was inadmissible hearsay." 280 F.3d at 349.

On review, the Third Circuit noted that the district court's position was "supported in cases cited by the Government," *id.,* including *Wood v. Bartholomew.* However, the court of appeals expressed no opinion on the reasonableness of such an approach. Rather, the court expressly agreed that the value of the nondisclosed statement would have been undercut by other corroborated testimony such that "there was no reasonable probability that the suppressed evidence would have changed the outcome of the original proceeding." *Id.* at 350. Such language is consistent with the approach taken by the Fifth, Seventh, and Eighth Circuits—namely, that a *Brady* violation occurs if there is a reasonable probability that the outcome of the trial would have been different if the information had been disclosed, because disclosure of the inadmissible evidence would have led to admissible evidence.

Here, in further support of its argument that the trial court erred in relying on this Court's holding in *Green*, the Commonwealth argues that this Court's post-*Green* decisions evidence a clear retreat by this Court from the position we espoused in *Green*—namely, that, under certain circumstances, inadmissible evidence is still considered material for *Brady* purposes. Specifically, the Commonwealth cites *Commonwealth v. McGill, supra, Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202 (2003), and *Commonwealth v. Lambert, supra.* In *McGill,* the appellant, Bernard McGill, alleged a *Brady* violation based on the Commonwealth's failure to disclose a statement made by McGill's former cellmate, who was a jailhouse informant, to detectives. In the statement, the informant, Hassan Bilal, averred that he had a conversation with McGill, wherein McGill admitted to stabbing and raping a woman, but said that he planned to "play[ ] like he is crazy" in court in an effort to establish an insanity defense.[13] 574 Pa. at 583, 832 A.2d at 1019. This Court rejected McGill's argument, stating:

> To establish a *Brady* violation, a defendant must show that: (1) the evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence at issue is favorable to the defendant; and (3) the evidence was material, meaning that prejudice must have ensued. *Strickler v. Greene,* 527 U.S. 263, 281–282 [119 S.Ct. 1936, 144 L.Ed.2d 286]. . . . "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *United States v. Agurs,* [*supra*]. *See also United States v. Bagley,* [*supra*] ("evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

In the case *sub judice,* the alleged *Brady* violation is mere conjecture. Bilal never testified at trial. The Common-

13. It is unclear why McGill believed this information was exculpatory.

wealth gave the statement of Bilal to trial counsel. McGill merely argues that Bilal testified for the Commonwealth in another case; he speculates that, had trial counsel asked the Commonwealth for documents relating to Bilal's partic-ipation in other cases, the Commonwealth would not have provided it. McGill does not even point to any other case in which Bilal supposedly cooperated with the Commonwealth. Thus, McGill has *failed to establish that there was any evidence to suppress, let alone that the Commonwealth willfully or inadvertently suppressed it.* Accordingly, McGill has not demonstrated a *Brady* violation.

*Id.* at 583–84, 832 A.2d at 1019–20 (emphasis added). As the emphasized text illustrates, while we recognized in *McGill* that materiality requires a reasonable probability, rather than a possibility, that the outcome of the trial would have been different, our decision that McGill failed to establish a *Brady* violation was based on a determination that no exculpatory or impeachment evidence was suppressed, either intentionally or inadvertently. Indeed, whether inadmissible evidence could be considered material was not an issue, and thus we question the Commonwealth's reliance on *McGill* in support of its position herein.

In *Commonwealth v. Mitchell,* the appellant, Isaac Mitchell, raised a *Brady* argument based on the Commonwealth's al-leged suppression of the prior criminal record of one of its primary witnesses, Montrell Washington, at the appellant's murder trial. According to the appellant, such evidence was exculpatory because "it would have bolstered Appellant's testi-mony that [Washington] had a gun on the night of the shooting, and because the two convictions would have served to undermine [Washington's] credibility." 576 Pa. at 281, 839 A.2d at 215–16. This Court rejected Mitchell's claim, noting that *there was no evidence that the Commonwealth actually suppressed Washington's prior criminal record. Id.* at 282, 839 A.2d at 216. Although we additionally noted that Mitchell failed to establish the evidence was material to his defense— because (1) there was no evidence linking the prior convictions to the current charges and (2) firearms violations are not

*crimen falsi,* they would not have been admissible to impeach Washington's credibility—these statements were made in the context of an alternative holding, and arguably were *dicta.*

Finally, the Commonwealth cites this Court's decision in *Commonwealth v. Lambert.* In *Lambert,* this Court considered several *Brady* claims raised by the appellant, James Lambert, who was convicted of first-degree murder and related offenses in connection with the robbery of a Philadelphia bar. Lambert, claimed, *inter alia,* that the Commonwealth violated *Brady* by failing to disclose a police activity sheet which indicated that an individual named Snyder advised the police that Snyder's brother told Snyder that two individuals, Paul and Robin Adams, had purchased a gun and planned to rob a bar. Upon learning of the robbery and murders at issue in the case, Snyder speculated that the Adamses had committed the crimes. Lambert maintained that the police activity sheet thus proved that someone other than him committed the robbery. We rejected Lambert's argument, stating:

> Contrary to appellant's assertion, the information contained in this document was not evidence that someone other than appellant committed the instant crimes. As the Commonwealth notes, the information contained in this document was an initial lead based on hearsay and speculation. As noted by this Court, the prosecution is not required to disclose to the defense "every fruitless lead followed by investigators of a crime." *Commonwealth v. Crews,* 536 Pa. 508, 640 A.2d 395, 406 (1994). Additionally, inadmissible evidence cannot be the basis for a *Brady* violation. *See Wood v. Bartholomew,* [*supra*] (reversing grant of habeas corpus relief where evidence withheld by prosecution was inadmissible; thus, disclosure not "reasonably likely" to have resulted in different outcome); *Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202, 216 (2003) (inadmissible evidence not material under *Brady*). Accordingly, the Commonwealth did not violate *Brady* by not disclosing this document.

584 Pa. at 475, 884 A.2d at 857. While this Court first determined that the evidence was not exculpatory to the

appellant, we then—as we did in *Mitchell*—offered the alter-
native reasoning that inadmissible evidence cannot be consid-
ered material under *Brady,* citing the Supreme Court's deci-
sion in *Wood* and our holding in *Mitchell.*

Notwithstanding our reference to admissibility in *Mitchell,*
and our citation to both *Mitchell* and *Wood* as part of an
alternative holding in *Lambert,* the language of our recent
decision in *Commonwealth v. Ly,* 602 Pa. 268, 980 A.2d 61
(2009),[14] suggests our continued endorsement of the position
we first espoused in *Green.* In *Ly,* the appellant, Cam Ly,
alleged that the prosecution violated *Brady* by failing to
disclose evidence primarily related to a witness identification
of a certain individual as a participant in the crime, which
conflicted with a prior identification by the same witness. Ly
alleged that the Commonwealth's failure to disclose evidence
of the conflicting identifications "undermined [his] ability to
develop alternative theories and defenses in the guilt phase
and to present mitigation evidence relating to his reduced role
[as an accomplice as opposed to the shooter] in the crime in
the penalty phase." 602 Pa. at 292, 980 A.2d at 75.

In addressing the materiality requirement of *Brady,* we
explained:

> [M]ateriality extends to evidence affecting the credibility
> of witnesses, rather than merely to purely exculpatory
> evidence. *See Giglio v. United States,* [405 U.S. 150, 92
> S.Ct. 763, 31 L.Ed.2d 104 (1972) ] ("When the 'reliability
> of a given witness may well be determinative of guilt or
> innocence,' nondisclosure of evidence affecting credibility
> falls within this general rule."). *Moreover, we have held
> that the protection of Brady extends to the defendant's
> ability to investigate alternate defense theories and to
> formulate trial strategy. See Commonwealth v. Green,*
> 536 Pa. 599, 640 A.2d 1242, 1245 (1994) (holding that
> courts must "consider any adverse effect that the prose-
> cutor's failure to disclose might have had on not only the

14. We recognize the parties did not have the benefit of this Court's
decision in *Ly,* which was issued on December 1, 2009, at the time they
filed their briefs in this case, or prior to oral argument.

presentation of the defense at trial, but the preparation of the defense as well."). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, [514 U.S. 419, 433–434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ].

602 Pa. at 293–94, 980 A.2d at 76 (emphasis added).

We held that Ly satisfied his burden of demonstrating that the evidence was favorable to him because it was related to the credibility of a witness, noting the evidence "could have been used to question [the witness'] identification of Appellant as the shooter, especially given the prosecution's attempt to bolster [the witness'] identification of Appellant with her identification of [another individual]." *Id.* at 297, 980 A.2d at 78.

While we ultimately concluded that Ly was not entitled to relief because he failed to demonstrate that the alleged *Brady* violations so undermined the truth determining process such that no reliable adjudication of guilt or innocence could have occurred,[15] we stated that *Brady* applies not only to purely exculpatory evidence or to evidence which relates to the credibility of witnesses, but also to evidence which impacts a defendant's ability to investigate alternate defense theories and to formulate trial strategy. *Id.* at 293–94, 980 A.2d at 76

---

**15.** *Ly* involved an appeal of the denial of relief under the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541–9546 ("PCRA"). In order to prevail on a *Brady* claim under the PCRA, a defendant must demonstrate that the alleged *Brady* violation "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Ly*, 602 Pa. at 294, 980 A.2d at 76 (citation omitted). In *Ly*, we specifically noted, *inter alia*, that the witness had never wavered in her identification of Ly as the shooter, and presented clear testimony as to why she remembered him so clearly. Additionally, the witness offered an explanation for her misidentification of another individual. With respect to Ly's claim that the Commonwealth improperly withheld other evidence in violation of *Brady*, this Court determined that each specific claim failed, either because the Commonwealth's failure to disclose was not prejudicial, or because the evidence was not material because it was neither exculpatory, nor related to the credibility of a witness.

(citing *Green,* 536 Pa. at 605, 640 A.2d at 1245). Additionally, we emphasized that the proper standard for determining the materiality of evidence withheld by the prosecution was the standard set forth by United States Supreme Court in *Kyles v. Whitley:* "favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 602 Pa. at 294, 980 A.2d at 76 (quoting *Kyles,* 514 U.S. at 433, 115 S.Ct. 1555).

Although we recognize that the language used in our pronouncements on the issue of whether evidence that is inadmissible at trial can be considered material evidence for purposes of *Brady* has been inconsistent, we nonetheless reject the Commonwealth's contention that *Green* should be overruled. Indeed, we have relied on *Green* in this regard as recently as December 2009 in *Ly.* Furthermore, as discussed above, we do not agree with the Commonwealth's contention that *Green* has been supplanted by the United States Supreme Court's decision *Wood.* Finally, having considered the approaches taken by the United States Supreme Court and the various circuit courts, we believe *Green* and *Ly* best accommodate the primary function of the trial process—the search for truth. *See Bagley,* 473 U.S. at 675 n. 6, 105 S.Ct. 3375 ("By requiring the prosecutor to assist the defense in making its case, the *Brady* rule represents a limited departure from a pure adversary model. The Court has recognized however, that the prosecutor's role transcends that of an adversary: he 'is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" (citations omitted)); *Kyles,* 514 U.S. at 439, 115 S.Ct. 1555 (noting that a prudent prosecutor will err on the side of disclosure of evidence that may be favorable to a defendant, which "is as it should be. Such disclosure will serve to justify trust in the prosecutor as 'the representative ... of a sovereignty ... whose interest [is] that justice shall be done.'" (citations omitted)).

■■■ Accordingly, we hold that admissibility at trial is not a prerequisite to a determination of materiality under *Brady*. Rather, the touchstone of materiality is whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Therefore, nondisclosed favorable evidence which is not admissible at trial may nonetheless be considered material for *Brady* purposes where the Commonwealth's failure to disclose such evidence adversely affected the presentation of the defense at trial, or the defense's preparation for trial, such that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Ly.* We emphasize, however, that "mere speculation" by a defendant will not be sufficient to meet this burden. *See Wood,* 516 U.S. at 6, 116 S.Ct. 7. Rather, in order to establish a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed, a defendant necessarily must identify specific evidence or information that would have been uncovered, and explain how that evidence or information would have changed the result of the proceeding.

### B.

■■■ Notwithstanding our determination that evidence may be considered material for *Brady* purposes, even if the evidence is inadmissible at trial, we conclude that the Superior Court in the instant case erred in finding Peoples' statement material under *Brady,* as Willis failed to demonstrate that, had Peoples' statement been disclosed in a timely manner by the Commonwealth, there was a reasonable probability that the result of the proceeding would have been different.

In support of its holding that Peoples' statement was not material for *Brady* purposes, Judge Bronson explained:

Here, the record establishes that disclosure of the statement could not have affected the outcome of the case. Although Peoples had pled guilty to several robberies, he did not plead to the robbery at issue in the case at bar and, therefore, retained the right to refuse to testify about that

robbery under the Fifth Amendment. Peoples was subpoenaed to a hearing held by the Court to address defendant's *Brady* claim, but was not brought down from state prison. At that hearing, the attorney for the Commonwealth represented that she had conferred with Peoples' attorney and was told that he would advise Peoples not to testify at any proceedings involving the robbery here at issue. That led the Court to find that Peoples would not have been available to testify at the trial of this case. Without Peoples' in-court testimony, his version of the events of the robbery that tended to exculpate the defendant would not have gone before the jury. His out-of-court statement was hearsay, and no exceptions to the hearsay rule were applicable.

Moreover, the evidence at the hearing established that Woodard did not resemble the defendant, thereby making it improbable that the complaining witness confused the defendant for Woodard and made a misidentification (N.T. 2/16/07 at 12 (defendant is 6′ 1 ½″ and Woodard is 5′ 8″ tall)). Where, as here, a defendant's conviction is premised upon eyewitness testimony and a positive identification, and not merely circumstantial evidence, an undisclosed witness statement that does not undermine the eyewitness testimony is not constitutionally material.

Finally, the Court notes that in an abundance of caution, the Court ordered, following the hearing on the *Brady* issue, that a photo spread be shown to the complainant that included a photo of Woodard, to verify that the complainant would not change his identification if Woodard was included as a suspect. Defense counsel subsequently filed a Supplement to Motion for Extraordinary Relief stating that "counsel is now unwilling to present any further photo spreads to the victim." Accordingly, at defendant's request, a photo spread including Woodard was never shown to the complainant.

While the Court does not condone the carelessness that led the Commonwealth to fail to turn Peoples' statement over to defense counsel prior to trial, there is simply no basis in the record to conclude that its failure to do so would

have changed the result of the trial. Accordingly, the Commonwealth's *Brady* violation does not entitle defendant to relief.

*Commonwealth v. Willis,* CP–51–CR–1000571–2005, at 6–7 (case citations, footnotes, and some record citations omitted).

The Superior Court, in concluding that Peoples' statement was material for *Brady* purposes, and thus reversing the trial court's determination, reasoned:

Peoples' statement would certainly have affected the preparation of the defense, if not the course of the trial. *Green, supra.* In particular, it would have added weight to certain facts raised by the defense: that the victim stated that he would not be able to positively identify his attacker and that Willis and Woodard have similar traits. At the very minimum, had Willis' attorney known of Peoples' statement she could have interviewed Peoples or Woodard or put Woodard's picture in a photo-array.

*Commonwealth v. Willis,* 1024 EDA 2007, at 5. The Superior Court further noted that there was "no proof that [Peoples] would have refused to testify," and that "even if the statement were not admissible, it is not the Commonwealth's role to determine how defense counsel shall use such evidence.... [C]ounsel still could have used it in the general preparation of the defense." *Id.* at 6.

The Commonwealth challenges the Superior Court's conclusions, asserting that disclosure of Peoples' statement would not have affected the outcome of Willis' trial because (1) absent Peoples' testimony, Willis would not have been permitted to introduce Woodard's photo and criminal history at trial, and there was no other evidence tying Woodard to the instant robbery; and (2) Willis failed to demonstrate that disclosure of Peoples' statement would have led to additional investigation that would have resulted in admissible evidence. Commonwealth's Brief at 12–13. Thus, the Commonwealth contends that Willis' claim that timely disclosure of Peoples' statement would have led to the discovery of admissible evidence, or was

reasonably likely to have resulted in a different outcome at trial, is mere speculation.

Conversely, Willis argues that, had defense counsel known of the identity of Woodard prior to trial, counsel would have investigated Woodard's background, especially his criminal history, and obtained a copy of Woodard's photo to show to the victim. Appellee's Brief at 40–41. Willis further maintains that the trial court erred in denying him relief on the basis that Peoples would have asserted his Fifth Amendment privilege against self-incrimination if called as a witness by the defense because the trial court simply accepted the prosecutor's representation in this regard, without determining the validity of Peoples' assertion. According to Willis, the Commonwealth "essentially prevented Peoples from testifying for the defendant. The prosecutor indicated that if Peoples admitted complicity in the robbery, he would be arrested for it. Such a threat is improper and interferes with the defendant's ability to establish his innocence." *Id.* at 49. Willis further asserts that trial counsel "could have sought immunity for Peoples for purposes of an evidentiary hearing." *Id.* at 41.

■ With respect to Willis' argument that, had Peoples' statement been disclosed, trial counsel could have investigated Woodard's criminal background and obtained a photo of Woodard to show to the victim, as the trial court noted, following the hearing on Willis' *Brady* claim, it directed that a photo array containing a photo of Woodard be shown to the victim for the purpose of ensuring that the victim's identification of Willis would not change if Woodard was included as a suspect, but defense counsel objected to this procedure. In his brief, Willis offers only the following explanation for counsel's objection: "The victim identified the defendant on a number of occasions and was in his presence during court proceedings. In view of this, it would not have been fair to the defendant to allow the victim to view a photo array with the defendant's photo in it." *Id.* at 51. Having been given the opportunity to present a photo array containing Woodard's photo to the victim and refusing that opportunity, Willis cannot now argue that he is entitled to a new trial because the

victim was not shown a photo array containing a photo of Woodard.

With regard to Willis' claim that the trial court erred in determining that Peoples' statement indicating that he committed the robbery with Woodard would not have been admissible at trial without independently verifying whether Peoples would have refused to testify, the Commonwealth points out that Willis failed to offer an affidavit or certification indicating that either Peoples or Woodard was willing to testify. In response, Willis claims that his failure to obtain an affidavit or certification is not fatal to his claim, as there was no purpose to be served by attempting to obtain an affidavit, in view of the prosecutor's representation that Peoples intended to assert his Fifth Amendment privilege against self-incrimination. We find it disingenuous for Willis to challenge the trial court's reliance on the prosecutor's statement that Peoples intended to assert his Fifth Amendment rights, yet rely on the prosecutor's statement to excuse his failure to attempt to obtain a written statement from Peoples as to whether he was willing to testify.

Finally, and notwithstanding the arguments set forth above, Willis concedes that, at the hearing on his *Brady* claim, "trial counsel did not fully explain to the trial court the evidence that could have been obtained from the timely disclosure of Peoples' statement," and suggests:

> If this Court believes that the record is insufficient as to prejudice sustained by the defendant resulting from the untimely disclosure of Peoples' statement, it is requested that the matter be remanded for additional hearings to address the question of Peoples' willingness to testify, Peoples' assertion of this Fifth Amendment privilege, immunity for Peoples and [Woodard], and the nature and extent of evidence that trial counsel could have presented had Peoples' statement been timely disclosed.

*Id.* at 41, 42.

██ In our view, any failure by trial counsel to adequately demonstrate at the evidentiary hearing the prejudice sus-

tained by Willis, or the evidence which could have been presented had Peoples' statement been timely disclosed, is more properly raised as an ineffectiveness claim on collateral review. Accordingly, we deny Willis' request for a remand.[16]

## IV.

For the reasons set forth above, we find that Willis has failed to demonstrate that there is a reasonable probability the outcome of his trial would have been different had Peoples' statement been disclosed by the Commonwealth in a timely manner. The Superior Court's conclusion that timely disclosure of Peoples' statement would have affected the preparation of the defense or the course of the trial, such that there was a reasonable probability that the outcome of trial would have been different, was based on mere speculation, which is insufficient to establish materiality under *Brady*. Accordingly, we reverse the order of the Superior Court granting Willis a new trial, and we remand for reinstatement of Willis' judgment of sentence.

Former Justice GREENSPAN did not participate in the decision of this case.

Justice BAER joins the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justices EAKIN and McCAFFERY join.

Justice SAYLOR files a concurring opinion.

**16.** Perhaps in an attempt to avoid collateral proceedings, the Commonwealth indicates that it joins Willis' request for a remand for a full evidentiary hearing on his *Brady* claim "[i]n the interest of obtaining a final and accurate resolution of the issue." Commonwealth's Reply Brief at 16. The Commonwealth further states: "Notwithstanding any ambiguous remarks at the prior listings in this case, the Commonwealth will not threaten Peoples with prosecution if he chooses to testify at an evidentiary hearing, nor will it object to any fair identification procedure in which the victim must distinguish between defendant and [Woodard]." *Id.* (footnote omitted). While we acknowledge that such a solution may be judicially efficient, we can neither condone, nor enable, an end-run around the PCRA. *See Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002) (generally, a petitioner should wait until collateral review to raise claims of ineffective assistance of trial counsel).

Chief Justice CASTILLE, concurring.

I concur in the result, as I agree that appellee did not prove that the undisclosed evidence at issue satisfied the materiality standard established by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. I write separately because I respectfully disagree with much of the Opinion Announcing the Judgment of the Court's ("OAJC") conception of the relevant decisional law, and in particular its approval of this Court's approach and decision in *Commonwealth v. Green*, 536 Pa. 599, 640 A.2d 1242 (1994), where this Court held that "[i]n determining the materiality of the omitted evidence we must, therefore, consider any adverse effect that the prosecutor's failure to disclose might have had on not only the presentation of the defense at trial, **but the preparation of the defense as well.**" *Id.* at 1245 (emphasis added). In my view, there is unavoidable tension in the OAJC's determination that *Green* was and is good law and its holding that the Superior Court erred in this case. The Superior Court panel below characterized *Green* with scrupulous accuracy; did no more than apply the letter of *Green* to the circumstances; and the materiality/prejudice cited by the Superior Court here was, if anything, less speculative than the ephemeral prejudice identified by the *Green* Court in awarding a new trial. The OAJC goes to unnecessary and, indeed, revisionist lengths to discount or minimize obvious and multiple difficulties with *Green*. It would be better for the Court to acknowledge and correct our own error, rather than saying that *Green* was right, and that the Superior Court here was wrong for faithfully applying that decision.

Relevant governing cases from the U.S. Supreme Court do not make it entirely clear whether *Brady* materiality will, or should be, expanded to evidence that is in itself inadmissible at trial—like the non-disclosed evidence at issue in this appeal. The OAJC essentially predicts that the U.S. Supreme Court will expand the definition of materiality to encompass inadmissible evidence but only in very narrow circumstances. The OAJC's ultimate test for materiality is formulated as follows:

[N]ondisclosed favorable evidence which is not admissible at trial may nonetheless be considered material for *Brady* purposes where the Commonwealth's failure to disclose such evidence adversely affected the presentation of the defense at trial, or the defense's preparation for trial, such that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. . . . We emphasize, however, that "mere speculation" by a defendant will not be sufficient to meet this burden. . . . **Rather, in order to establish a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed, a defendant necessarily must identify specific evidence or information that would have been uncovered, and explain how that evidence or information would have changed the result of the proceeding.**

OAJC Op. at 670 (emphasis added).

I have no difficulty with the aspect of the OAJC's prediction highlighted above, since it implicitly rejects and overrules *Green,* and it retains the core reasonable probability test actually established in the *Brady* cases, and thereby retains the proper effect-upon-the-trial focus. As I understand the OAJC's post-*Green* test, materiality requires that the undisclosed evidence either be admissible in its own right, or else there must be some showing by the defendant that the inadmissible evidence would have led to concrete, derivative evidence that would have been both admissible and outcome-changing. Under this test, which goes a step farther than the U.S. Supreme Court's precedent, I agree with the OAJC that appellee failed to establish a viable *Brady* claim, as his materiality argument—like the materiality argument of the defendant in *Green*—is entirely speculative.

The *Green* Court did not identify or apply the standard of materiality the OAJC approves today. There are three basic problems with *Green.* First, *Green* misapprehended the governing cases from the U.S. Supreme Court respecting *Brady* materiality. Second, and from that misapprehension, *Green* fashioned its broad standard of materiality as embracing "any

adverse effect" nondisclosure "might have had" on defense preparation. This standard was an erroneous articulation of federal law on the day *Green* announced it. And, third, *Green* then actually granted relief premised upon pure speculation as to the possible effect of the non-disclosure: certainly the Court never required that the "defendant necessarily must identify specific evidence or information that would have been uncovered, and explain how that evidence or information would have changed the result of the proceeding." The Superior Court erred here only because it followed *Green's* speculative-effect-on-defense-preparation rule of materiality.

As a preliminary matter, it is important to remember that *Green's* holding was rendered as a matter of federal constitutional law. *See* 640 A.2d at 1244 n. 5. The *Brady* issue presented here likewise sounds exclusively in federal law, and not Pennsylvania law, except insofar as this Court's decisional law faithfully interprets the federal command in *Brady* and its progeny. If Pennsylvania decisional law is contrary to the High Court's *Brady* decisions, that law is erroneous, and should be adjusted. *See Council 13, American Federation of State, County and Mun. Employees, AFL–CIO ex rel. Fillman v. Rendell,* 604 Pa. 352, 986 A.2d 63, 77–78 (2009).

*Green* is specifically challenged by the Commonwealth and, in my view, *Green's* extension of *Brady* materiality to encompass mere speculative effects upon defense trial preparation does not pass muster. The *Green* holding on materiality was rendered in the course of a very brief discussion of but two cases from the U.S. Supreme Court, *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). But, neither case—indeed, no case from the U.S. Supreme Court before or since *Green*—supports the proposition that *Green* stated as a settled federal command from the High Court.

I begin by quoting in full the brief, relevant portion of *Green* respecting the notion that *Brady* materiality includes possible effects on defense trial preparation:

Recently, in *Commonwealth v. Moose,* 529 Pa. 218, 602 A.2d 1265 (1992), this Court discussed in detail the holding in *Brady* and its progeny. As we noted there, materiality is determined by different standards depending upon whether trial counsel made a specific or a general request for exculpatory evidence. For instance, where the defense gives the prosecution notice of exactly what the defense desires, the test of materiality is whether the evidence might have affected the outcome of the trial. *Commonwealth v. Moose,* 529 Pa. at 233, 602 A.2d at 1272, *quoting United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342, 350 (1976). Where, as here, a general, as opposed to specific, request for exculpatory evidence is made, the evidence is material "if the omitted evidence creates a reasonable doubt that did not otherwise exist . . ." *Moose,* 529 Pa. at 233, 602 A.2d at 1272, *quoting Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355. The Court in *Agurs* further stated that

> the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Agurs,* 427 U.S. at 112–113, 96 S.Ct. at 2402, 49 L.Ed.2d at 355. In determining the materiality of the omitted evidence we must, therefore, consider any adverse effect that the prosecutor's failure to disclose might have had on not only the presentation of the defense at trial, but the preparation of the defense as well. *See, United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Upon application of these principles to the facts of the instant case, we conclude that the evidence withheld by the Commonwealth is relevant and material.

*Green,* 640 A.2d at 1244–45. If the *Green* Court merely quoted *Bagley* accurately, the disputed proposition would be secure. But, *Green* in fact did not purport to quote *Bagley* for

its extension of *Brady* materiality to defense trial preparation; and indeed, *Bagley* does not support the proposition. This key proposition of federal law is the sole product of the *Green* Court; it is erroneously stated as if it is the settled command of the High Court; and it cannot be squared with then-extant authority from the High Court.

It is difficult to decipher which, if any, U.S. Supreme Court decision the *Green* Court thought was support for its novel proposition. The proposition followed immediately after the block quote from *Agurs;* but, that quotation merely spoke to the effect of the "additional [*Brady* ] evidence" when evaluating the trial record, and did not say that materiality extended to possible effects on trial preparation. The proposition was then followed by the "*See Bagley* " citation, without indicating a page number in *Bagley* or other explanation of the relevance of *Bagley.* Since the *Green* proposition included the qualifier "therefore," it would appear that the Court intended to refer back to its inapposite, preceding quotation from *Agurs.* In short, the *Green* Court's formulation is confusing, summary, and a non sequitur.[1] For present purposes, it is enough to realize that the *Green* Opinion did not indicate where, in the precedent of the U.S. Supreme Court, there was support for the notion that *Brady* materiality extended to possible effects on defense trial preparation.

This is not a quibble. *Green* stated its proposition concerning possible effects on trial preparation as an affirmative proposition of federal law, found in governing precedent from the U.S. Supreme Court. If the proposition indeed was settled and emanated from the High Court, and *Green* merely failed to properly identify or articulate the source, it would be but a minor matter. In point of fact, the U.S. Supreme Court has never embraced the proposition; indeed, U.S. Supreme

---

1. The OAJC characterizes the "therefore" language as an "inadvertently misplaced adverb by the *Green* Court, and not a deliberate misrepresentation of the law." OAJC Op. at 660. I have not suggested that the *Green* Court "misrepresented" the law; rather, I am demonstrating its misapprehension and misstatement of governing federal law, which is not remotely the same thing. I do not doubt that the error in *Green* was in good faith, but it is an error nevertheless that we have a responsibility to recognize.

Court cases strongly suggest disapproval of the rule *Green* discerned.

Take *Agurs,* for example. Far from holding that *Brady* materiality extends to possible effects on defense preparation, the *Agurs* Court specifically rejected a defense argument that "the standard [for assessing *Brady* materiality] should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence." 427 U.S. at 112 n. 20, 96 S.Ct. 2392. The Court stated that "[s]uch a standard" of materiality "would be unacceptable ... for two reasons":

> First, that standard would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor's entire case would always be useful in planning the defense. Second, such an approach would primarily involve an analysis of the adequacy of the notice given to the defendant by the State, and it has always been the Court's view that the notice component of due process refers to the charge rather than the evidentiary support for the charge.

*Id.* This explanation, strongly based in the due process rationale of the *Brady* rule, rejected the broad definition of materiality *Green* announced; yet, the *Green* Court betrayed no awareness of the determination. Compounding the *Green* Court's error, the OAJC today acknowledges that the *Agurs* Court rejected this broader and vaguer materiality standard but glosses over that rejection by stating that the *Green* Court, despite its citation to the contrary, actually based its decision on *Bagley,* a conclusion that is unsupported by the *Green* Opinion.

Furthermore, the *Agurs* Court also addressed the issue of admissibility as it relates to materiality, in its following characterization and interpretation of the Court's decision in *Brady:*

> This Court granted certiorari to consider Brady's contention that the violation of his constitutional right to a fair trial vitiated the entire proceeding. The holding that the

suppression of exculpatory evidence violated Brady's right to due process was affirmed, as was the separate holding that he should receive a new trial on the issue of punishment but not on the issue of guilt or innocence. The Court interpreted the Maryland Court of Appeals opinion as ruling that the confession was inadmissible on that issue. For that reason, the confession could not have affected the outcome on the issue of guilt but could have affected Brady's punishment. It was material on the latter issue but not the former. And since it was not material on the issue of guilt, the entire trial was not lacking in due process.

427 U.S. at 105–06, 96 S.Ct. 2392 (footnote omitted). Consistently with the due process basis for the constitutional restriction, *Agurs* specifically tied *Brady* materiality to admissibility; and it squarely rejected the notion, incorrectly stated as the governing rule of federal law in *Green* and repeated by the OAJC today, that *Brady* materiality may be measured by the effect on the defendant's ability to prepare for trial. Notably, *Green* recognized the non-materiality holding in *Brady* and went to some lengths to confine *Brady* to its facts. Thus, *Green* dismissed *Brady's* holding that effects on mere trial defense strategy did not rise to a constitutional violation, stating: "it is clear that the holding in *Brady* as to the admissibility of the evidence was based solely upon the precise facts of that case and in no way mandates that the evidence first be admissible before it can be deemed 'material' to the defense." *Green*, 640 A.2d at 1246. Leaving aside the advisability of an inferior court seeking to confine binding precedent from the High Court to its "precise facts," the *Green* Court made no attempt to distinguish *Agurs* via its "precise facts" or otherwise.

Notably, the *Agurs* footnote squares entirely with *Brady* itself, which necessarily calls into question the legitimacy of *Green's* attempt to "limit" *Brady* factually. The question in *Brady* concerned the effect of the prosecution's unintentional withholding of a statement by Brady's co-conspirator, Boblit, in which Boblit admitted that he had committed the actual killing for which both men were found guilty of first-degree

murder and sentenced to death in separate trials. The Maryland Court of Appeals held that the prosecution had denied Brady due process of law by withholding Boblit's statement despite Brady's request for such statements and remanded for a retrial of the question of punishment only, but not the question of guilt. The state court determined that nothing in Boblit's statement would have reduced Brady's degree of culpability below first-degree murder, and therefore, limited his retrial to the issue of punishment.

The U.S. Supreme Court affirmed, holding that a federal due process violation occurs where the prosecution fails to turn over requested, favorable, material evidence to the defense:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

> The principle of *Mooney v. Holohan* [294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935),] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts." A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not "the result of guile," to use the words of the Court of Appeals.

*Brady,* 373 U.S. at 87–88, 83 S.Ct. 1194 (footnote and citation omitted).

As to the issue of guilt phase admissibility discussed by the Maryland Court of Appeals, the U.S. Supreme Court acknowledged in *Brady* that admissibility is a factor in determining whether a due process violation has occurred. Significantly, the Court affirmed the grant of a new trial as to penalty only, indicating its agreement that inadmissible evidence is not material to the jury's determination of guilt or innocence. In addition, the *Brady* Court found that the tangential trial strategy implications arising from a hope to make use of inadmissible evidence did not raise an issue of constitutional dimension:

> In the present case a unanimous Court of Appeals has said that nothing in the suppressed confession "could have reduced the appellant Brady's offense below murder in the first degree." We read that statement as a ruling on the admissibility of the confession on the issue of innocence or guilt. A sporting theory of justice might assume that if the suppressed confession had been used [i.e., against the co-defendant] at the first trial, the judge's ruling that it was not admissible on the issue of [Brady's] innocence or guilt might have been flouted by the jury just as might have been done if the court had first admitted a confession and then stricken it from the record. But we cannot raise that trial strategy to the dignity of a constitutional right and say that the deprival of this defendant of that sporting chance through the use of a bifurcated trial denies him due process or violates the Equal Protection Clause of the Fourteenth Amendment.

*Id.* at 90–91, 83 S.Ct. 1194.

Even assuming that it is a wise or legitimate practice for an inferior court to limit the teachings of the High Court on questions of federal constitutional law to their "precise facts," as *Green* did to this inconvenient portion of *Brady*, the footnote in *Agurs* should have been a corrective elixir. The simple fact of the matter is that the *Green* Court failed to read *Agurs* closely enough, and it then misstated federal law. The footnote discussion in *Agurs* could perhaps be read as *dicta*, albeit *dicta* which reaffirmed that the theoretical underpin-

nings of *Brady* require a focus on trial admissibility. But *Green* did not do that; instead, *Green* erroneously stated that the High Court had affirmatively established an extremely broad and disruptive federal rule embracing effects on trial preparation when, in fact, the Court had indicated the precise opposite. We should not condone such unfortunate mistakes by straining to insist that *Green* was and is an accurate statement of the law as set forth by the U.S. Supreme Court when it clearly is not; and we certainly should not lay the blame at the feet of the Superior Court when all the panel did was apply *Green* faithfully.

*Bagley,* which the *Green* Court also cited as unexplained support for its black-letter-law proposition that *Brady* materiality may be measured by speculative effects on defense preparation, makes *Green* more problematic, not less. *Bagley* involved undisclosed impeachment evidence. Bagley was indicted in federal court on drug and firearms charges. Prior to trial, he requested whether any agreements, promises or inducements had been offered to the two principal government witnesses against him. The government's response did not disclose any such arrangements, but included affidavits from the two witnesses stating that the affidavits were made without any threats, rewards, or promises of rewards. After Bagley was convicted, in response to Freedom of Information and Privacy Act requests, he received copies of contracts between the two witnesses and the Bureau of Alcohol, Tobacco and Firearms ("ATF") revealing that the witnesses were paid for the information they supplied to ATF. Bagley filed a federal *habeas corpus* petition, on *Brady* grounds. The District Court denied relief, finding beyond a reasonable doubt that the evidence, if disclosed, would have had no effect on the jury's determination of guilt. The U.S. Court of Appeals for the Ninth Circuit reversed, holding that the non-disclosure affected Bagley's ability to conduct an effective cross-examination, and thus "automatic reversal" was required.

On further review, the U.S. Supreme Court reversed the Ninth Circuit. As recognized by the OAJC, Justice Blackmun's opinion is divided into three Sections, the first two of

which represented a majority view, joined by Chief Justice Burger and Justices O'Connor, White, and Rehnquist. Justice O'Connor provided the sole joinder in the third Section. Justice White wrote a concurrence joined by the Chief Justice and Justice Rehnquist. Justices Brennan, Marshall, and Stevens dissented.

Section I of the *Bagley* Opinion outlined the factual and procedural history, while Section II explained that the Ninth Circuit obviously had erred in applying an automatic reversal rule for *Brady* violations involving impeachment evidence. In so doing, the Circuit had elevated impeachment evidence above exculpatory evidence, and had ignored directly controlling precedent. The Court noted that the test for relief under *Brady* is materiality: "a constitutional error occurs, and the conviction must be reversed, only if the error is material in the sense that its suppression undermines confidence in the outcome of the trial." 473 U.S. at 678, 105 S.Ct. 3375. The Court reversed and remanded for consideration under the proper standard.

In Section III, Justice Blackmun, joined only by Justice O'Connor, discussed materiality at some length. In that discussion, he adverted to the test for materiality recently announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (concerning ineffective assistance of counsel), as materiality affects a determination of prejudice. Justice Blackmun opined: "And in [*Strickland*], the Court held that a new trial must be granted when evidence is not introduced because of the incompetence of counsel only if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). Justice Blackmun then further discussed materiality:

> The Government suggests that a materiality standard more favorable to the defendant reasonably might be adopted in specific request cases. See Brief for United States 31. The Government notes that an incomplete response to a specific request not only deprives the defense of

certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued. *Ibid.*

We agree that the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption. **This possibility of impairment does not necessitate a different standard of materiality, however, for under the *Strickland* formulation the reviewing court *may* consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.** The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*Id.* at 682–83, 105 S.Ct. 3375 (emphases added).

Justice White's very brief concurrence, representing the view of three Justices, noted that he agreed only that, for purposes of the materiality inquiry, " 'evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* at 685, 105 S.Ct. 3375 (White, J., concurring) (quoting Justice Blackmun's opinion, *id.* at 682, 104 S.Ct. 2052). Justice White thought the standard had sufficient flexibility, such that there was no reason to engage in Justice Blackmun's further analysis. Justice White never spoke to defense preparation, much less did he speak to speculative effects upon defense preparation.

The *Green* Court's citation to *Bagley* apparently intended to refer to Section III of Justice Blackmun's opinion, without recognizing that the expression represented the view of but two Justices. In addition, *Green* failed to recognize that this *dictum* spoke to a very specific sub-class of *Brady* claims. And, finally, *Green* mischaracterized the *dictum*, taking a suggested **permissive** qualifier—courts **may** consider the effect on trial preparation—and reading it as mandatory.

In response to these observations, the OAJC insists that, although the *Green* Court's citation to *Bagley* "arguably suggested that its result was dictated by the holding of a majority in *Bagley* ... we do not believe this Court's holding in *Green* was inconsistent with *Bagley*." OAJC Op. at 661. The point is not "arguable." Justice Blackmun's two-Justice opinion was the one that spoke of effects on defense preparation, and *Green* cited it as if it were a majority holding. The OAJC then speculates that the defense preparation passage from Justice Blackmun's two-Justice opinion, when bootstrapped to Justice White's three-Justice concurrence, supports a tacit five-Justice holding that *Brady* materiality extends to trial preparation. The OAJC says that Justice White "expressed no discomfort with Justice Blackmun's suggestion that, under *Strickland*, a determination of *Brady* materiality may include consideration of any adverse effects on trial preparation resulting from nondisclosure." *Id.* at 661. The OAJC puts words into Justice White's mouth; he wrote specifically and narrowly to explain that he would go no further than approve of the reasonable probability/result of the proceeding test.

Moreover, even if the *Bagley* opinions could support this tortured reconstruction, it would not change the point. The *Green* Court stated its proposition about possible effects on mere preparation as if it were clear, black letter law from majority expressions of the High Court. This simply was not the case. *Green* is a problem precedent: it did not square with *Brady* and its progeny on the day it was decided, and we should own up to the error.

In the fifteen years since the decision in *Green*, the U.S. Supreme Court has revisited *Brady* on a number of occasions,

dealing with various applications of *Brady* and refining the standard of materiality. *See District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009) (*Brady* obligations do not extend to post-conviction proceedings); *Cone v. Bell*, 556 U.S. 449, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009) (distinction between materiality under *Brady* for purposes of determination of guilt and sentencing); *Banks v. Dretke*, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (lower court erred in dismissing as procedurally defaulted *Brady* claim involving evidence of witness's informant status where claim arose pre-Antiterrorism and Effective Death Penalty Act and defendant exhausted state court remedies); *United States v. Ruiz*, 536 U.S. 622, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002) (prosecution not required to disclose potential impeachment evidence prior to entering plea agreement with defendant); *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (defendant could not establish *Brady* violation where he failed to show reasonable probability that conviction or sentence would have been different had suppressed documents been disclosed); *Wood v. Bartholomew*, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (prosecution failure to disclose that witness failed polygraph test did not deprive defendant of "material" evidence under *Brady* rule due to absence of reasonable likelihood that disclosure would have resulted in different outcome at trial); *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (outlining four aspects of materiality under *Bagley* and discussing their application). In none of these cases has the Court affirmatively said that *Brady* materiality extends to mere possible effects upon defense preparation, rather than admissible evidence.

*Wood v. Bartholomew* is the most relevant here. *Wood* was a *per curiam* opinion, granting certiorari and reversing the decision of the U.S. Court of Appeals for the Ninth Circuit, which discussed whether undisclosed evidence must be admissible to be material for *Brady* purposes. The prosecution in *Wood* did not disclose to the defendant that the defendant's brother, who was a prosecution witness, had taken a poly-

graph examination, the result of which suggested that his later trial testimony, claiming that he was not at the scene of the crime with the defendant, was deceptive. The U.S. Supreme Court reiterated that evidence is "material" under *Brady* "only where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different." 516 U.S. at 5, 116 S.Ct. 7 (citing *Kyles*, 514 U.S. at 433–34, 115 S.Ct. 1555). The Court found, in the strongest terms, that the polygraph results were not "evidence" within the meaning of *Brady* because they were inadmissible under state law, even for purposes of impeachment, absent agreement of the parties; and for that reason, their disclosure would not have affected the outcome of the trial:

> If the prosecution's initial denial that polygraph examinations of the two witnesses existed were an intentional misstatement, we would not hesitate to condemn that misrepresentation in the strongest terms. But as we reiterated just last Term, evidence is "material" under *Brady*, and the failure to disclose it justifies setting aside a conviction, only where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Kyles v. Whitley*, 514 U.S. 419, 433–434, 115 S.Ct. 1555, 1565–1566, 131 L.Ed.2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985) (opinion of Blackmun, J.); *id.*, at 685, 105 S.Ct., at 3385 (White, J., concurring in part and concurring in judgment). To begin with, on the Court of Appeals' own assumption, the polygraph results were inadmissible under state law, even for impeachment purposes, absent a stipulation by the parties, see 34 F.3d, at 875 (citing *State v. Ellison*, [36 Wash.App. 564, 676 P.2d 531 (1984) ] ), and the parties do not contend otherwise. The information at issue here, then—the results of a polygraph examination of one of the witnesses—is not "evidence" at all. Disclosure of the polygraph results, then, could have had no direct effect on the outcome of trial, because respondent could have made no mention of them either during argument or while questioning witnesses.

*Id.* at 5–6, 116 S.Ct. 7.[2]  Thus, the *Wood* Court reconfirmed that undisclosed evidence that is inadmissible at trial cannot give rise to a *Brady* violation.  Even if *Green* had not been wrong on the day it was decided, it became wrong when *Wood* was decided.  *Brady* materiality does not include mere possible "adverse effects" upon "defense preparation."

Finally, and as I noted at the outset, the materiality rule the OAJC ultimately devises in this case impeaches its insistence that the standard and decision in *Green* were correct when that case was decided and its concomitant suggestion that *Green* remains good law.  Again, *Green* said that materiality includes "adverse effects" that a failure to disclose "might have had" on defense preparation.  But, the OAJC today would hold that:

> We emphasize, however, that "mere speculation" by a defendant will not be sufficient to meet this burden. . . . Rather, in order to establish a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed, a defendant necessarily must identify specific evidence or information that would have been uncovered, and explain how that evidence or information would have changed the result of the proceeding.

OAJC Op. at 670.

*Green* did not apply this test:  *Green's* actual summary grant of a new trial in that capital murder case, without so much as a remand, was based **entirely** upon "mere speculation."  Here is the *Green* Court's dispositive analysis: "knowledge of [the undisclosed, inadmissible evidence] certainly would have opened another avenue of investigation for the defense that may well have led to further exculpatory evidence.  Had the defense been aware of Moser's statements, it may also have altered its trial strategy, especially in regards to appellant's decision not to testify. . . ." 640 A.2d at 1245–46.

---

**2.**  Notably, the *Wood* Court, unlike the *Green* Court, was careful to identify the actual precedential standing of *Bagley* on this point;  and when it spoke of what the *Bagley* lead opinion and concurrence could be said to have established, it confined its characterization to the reasonable probability standard, with no mention of speculative effects upon trial preparation.

There are no specifics in these "may haves." It is simply speculation upon speculation. No specific evidence is identified. Ultimately, the OAJC finds that the Superior Court in this case erred because its determination that the outcome would have been different "was based upon mere speculation." But, in so holding, the Superior Court was merely reflecting fidelity to the *Green* mistake. The OAJC "doth protest too much"[3] in its effort to defend *Green;* the OAJC in fact would overrule the decision *sub silentio*—and correctly so.

What the U.S. Supreme Court's cases may have left open, including after *Wood,* is the question of whether a *Brady* violation may be established if the defendant can specifically identify difference-making, admissible, derivative evidence arising directly as a result of the non-disclosed evidence. And, as the OAJC aptly summarizes, there has been much litigation over this point. *See* OAJC Op. at 661–65. Federal circuit courts indeed have held that the *Wood* decision should not be interpreted to mean that any evidence that is not admissible on its own cannot give rise to a *Brady* violation. *See, e.g., Maynard v. Government of the Virgin Islands,* 392 Fed.Appx. 105 (3d Cir. Aug. 25, 2010). *See also United States v. Wilson,* 605 F.3d 985, 1005 (D.C.Cir.2010) ("[T]o be 'material' under *Brady,* undisclosed information or evidence acquired through that information must be admissible."); *United States v. Price,* 566 F.3d 900, 911 (9th Cir.2009) (*Wood* Court did not reject notion that inadmissible evidence that would lead to discovery of admissible evidence can be subject of *Brady* claim); *Ellsworth v. Warden,* 333 F.3d 1, 5 (1st Cir.2003) (joining "most circuits" holding that *Brady* violation occurs where suppressed evidence is inadmissible but would lead directly to admissible evidence); *United States v. Gil,* 297 F.3d 93 (2d Cir.2002) (*Brady* material need not be admissible if it could lead to discovery of admissible evidence). *Cf. United States v. Erickson,* 561 F.3d 1150, 1164 (10th Cir.2009) (to support motion for new trial based on *Brady,* defendant must produce admissible evidence that, if believed, would warrant relief). Indeed, the ultimate rule the OAJC fashions

---

**3.** William Shakespeare, Hamlet (act III, sc. 2).

here is taken from these cases, focusing on derivative admissible evidence.

Of course, these cases represent predictions of what the U.S. Supreme Court would hold, if faced with the question; they do not bind this Court. Having said that, we are positioned the same as the lower federal courts—*i.e.*, we must attempt to predict what the High Court would do, given its prior pronouncements. For my own part, I have no difficulty with the OAJC's prediction. But, I would specifically acknowledge the fact that the question is an open one, and I cannot agree that the issue somehow was already properly decided by *Green,* when it was not. *Green* did not speak of specific and admissible derivative evidence. It spoke vaguely, broadly, and wrongly of possible effects upon "defense preparation," and decided the case upon speculation, which is decidedly not the same thing. In addition, taking a lesson from the *Green* mistake, I would not fashion an overly broad pronouncement, but I would require that the derivative, admissible evidence be specifically identified, with an explanation of why it is difference-making under the reasonable probability standard. Under that standard, I agree that appellee here, as in *Green,* has failed to offer anything beyond mere speculation.

The OAJC ultimately has rendered a self-contradictory opinion, by both relying on and repeating the error in *Green,* and then by adopting a derivative evidence materiality rule that would essentially overrule *Green.* I would acknowledge the error in *Green* and specifically overrule the case, and supplant that erroneous rule with the one I describe above. Accordingly, I concur only in the result.

Justices EAKIN and McCAFFERY join this opinion.

Justice SAYLOR, concurring.

I join the Opinion Announcing the Judgment of the Court, except for the treatment of *Commonwealth v. Green,* 536 Pa. 599, 640 A.2d 1242 (1994). I find the reasoning of *Green* too cryptic to provide a useful platform for clarification.