J-S30025-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JARON AMBROSE | : | |
| | : | |
| Appellant | : | No. 2473 EDA 2022 |

Appeal from the PCRA Order Entered September 15, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0008198-2011

BEFORE:  BENDER, P.J.E., LAZARUS, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, J.:                **FILED SEPTEMBER 21, 2023**

Jaron Ambrose appeals from the order, entered in the Court of Common Pleas of Philadelphia County, dismissing his serial petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  Upon our review, we affirm.

Ambrose was convicted of first-degree murder and related charges stemming from an incident that occurred on July 1, 2010, in which he approached a group of people sitting on a porch on Marvine Street in Philadelphia and shot two of them, wounding one fatally.  The third person present on the porch, Shaquita Morton, witnessed the shooting.  Later that afternoon, Morton provided a description of the shooter to the police.  Morton told police he had on a white t-shirt, brown Adidas sweatpants with an orange stripe on the side, and tan Timberland boots.  She stated that his hair was "low cut" and he had "light skin."  N.T. Trial, 12/4/12, at 133.  She described

him as "five-foot-eight, maybe six feet" with a "muscular buil[d]" and stated that he was "[b]etween 18 and 25" years old. *Id.* at 134.

Later that same evening, a vigil was held for the victim on Morton's block, which she attended. During the vigil, Morton was approached by the victim's cousin and shown a picture from Facebook. Morton was asked "is this [the shooter]?" to which her reaction[1] was "Oh, my God. Yes." *Id.* at 146. Morton testified that she was certain that the individual in the Facebook photo was the shooter. *See id.* at 147. Morton did not, however, contact the police to tell them she had seen a photograph of the shooter, as she "wanted to be done with this" and thought she had given the police "all they needed to know." *Id.* at 148-49.

The police subsequently learned that Morton had identified the gunman from a photograph at the vigil and contacted her for a further interview, which Morton attended voluntarily. While there, police presented Morton with a photographic array consisting of Ambrose's photograph and seven other people. Morton identified Ambrose in the array and also confirmed her identification of the Facebook photo as Ambrose.

Shikeda Johnson also testified at trial. She stated that she was present at the vigil on the evening of the shooting and saw Morton there, but that she was "drunk and high" and, thus, did not really remember anything. N.T. Trial, 12/5/12, at 28-29. Johnson testified that she later gave a statement to two

---

[1] Morton could not recall whether she actually said those words out loud. *See* N.T. Trial, 12/4/12, at 146-47.

detectives, one of whom was former detective James Pitts, who was subsequently fired from the force for misconduct. Johnson claimed that the detectives pressured her into speaking with them and told her that if she did not sign the statement they had prepared, "they were going to take [her] daughter and lock [Johnson] up." *Id.* at 35. The statement Johnson signed, purportedly under duress, stated, in relevant part:

> [Johnson:] We were all out on Marvine because there was a vigil out there. I know there was a lot of people out there talking about who killed [the victim]. Someone said the name of the guy that shot [the victim]. I recognized the name when they said it then but I really don't remember it now. Anyway, my friend Chuck was out there, too. When they said the name, Chuck was like, ["]Wait a minute.["] He seemed shocked by the name and wanted to see if it was the guy he knew. So he asked if somebody could get on Facebook. We went over to [Morton's] steps. And she was there with Robin and maybe some other people. And I asked if someone could let Chuck pull up the photo. When Chuck got on, he pulled up a photo and **[Morton's] eyes got real wide. And she was like[, "]That's him. That's him.["] She said that she never would forget his face.**

*Id.* at 45-46 (emphasis added).

Then-detective Pitts testified at trial regarding, *inter alia*, his interactions with Johnson. He stated that Johnson "didn't want to be involved," as she was "fearful for her safety, her child's safety." N.T. Trial, 12/6/12, at 26. Pitts testified that Johnson ultimately agreed to give a written statement, which he recorded, "*verbatim*," and she signed. *Id.* at 27, 32. Pitts did not interview Morton, nor was he involved in presenting her with the photographic array in which she identified Ambrose as the shooter.

On December 7, 2012, a jury convicted Ambrose of first-degree murder and related offenses. That same day, the court sentenced Ambrose to life imprisonment, plus concurrent sentences for the remaining convictions. This Court affirmed Ambrose's judgment of sentence on December 4, 2013, *see* ***Commonwealth v. Ambrose***, 93 A.3d 500 (Pa. Super. 2013) (Table), and he did not seek allowance of appeal in the Pennsylvania Supreme Court.

On January 31, 2014, Ambrose filed his first *pro se* PCRA petition. Court-appointed counsel filed an amended petition raising, *inter alia*, an after-discovered-evidence claim based on a newspaper article that former detective Pitts had engaged in misconduct in other cases. The PCRA court denied relief and this Court affirmed. With regard to Ambrose's after-discovered-evidence claim concerning Pitts, the Court concluded that, because Johnson had testified at trial as to Pitts' alleged misconduct during her interview, Ambrose failed to establish "why any testimony regarding possible police misconduct could not have been obtained before the conclusion of trial by the exercise of reasonable diligence." ***Id.***, 2227 EDA 2015, at *6 (Pa. Super. filed 8/3/17) (unpublished memorandum decision). The Supreme Court rejected Ambrose's petition for allowance of appeal. ***See id.***, 174 A.3d 569 (Pa. 2017) (Table).

Ambrose filed a second, counseled PCRA petition on December 29, 2017. In that petition, Ambrose sought relief based on what he asserted was newly-discovered evidence regarding Pitts' "habitual pattern, practice, and routine of coercing witnesses into signing false statements." ***Id.***, 1464 EDA 2018, at *3 (Pa. Super. filed 7/23/19) (unpublished memorandum decision).

- 4 -

The PCRA court dismissed the petition as untimely, and Ambrose appealed to this Court. On appeal, we rejected Ambrose's attempt to circumvent the PCRA time-bar pursuant to the newly-discovered-facts exception, holding that "[b]ecause Ambrose raised this claim in a prior PCRA petition, he cannot establish that the 'fact' upon which he based his 2017 PCRA petition was [previously] unknown to him." **Id.** at *4. Accordingly, we affirmed the PCRA court's dismissal of his petition, and our Supreme Court denied discretionary review. **See id.**, 227 A.3d 870 (Pa. 2020) (Table).

Ambrose, acting *pro se*, filed this, his third PCRA petition, on May 16, 2022. After the PCRA court issued Pa.R.Crim.P. 907 notice of its intent to dismiss, current counsel entered his appearance and filed a response requesting leave to file an amended petition, which the court granted. In the amended petition, counsel argued that Ambrose was entitled the benefit of the newly-discovered-fact and governmental-interference exceptions to the jurisdictional PCRA time bar, as well as substantive relief in the form of a new trial, as a result of a **Brady**[2] violation by the Commonwealth. Specifically, counsel asserted that the Commonwealth failed to disclose two instances of sustained Internal Affairs ("IA") findings against former detective Pitts. This information was provided to Ambrose by a fellow inmate, Derrill Cunningham,[3]

---

[2] **Brady v. Maryland**, 373 U.S. 83 (1963).

[3] In PCRA proceedings initiated by Cunningham, the Commonwealth conceded that his constitutional rights under **Brady** had been violated because it had
*(Footnote Continued Next Page)*

- 5 -

in March 2022, and Ambrose filed his *pro se* petition two months later, in May 2022.

On August 11, 2022, the PCRA court issued Rule 907 notice of intent to dismiss. The court concluded that: (1) Ambrose's claim did not satisfy the newly-discovered-fact exception, as he had long been aware of Pitts' propensity for witness intimidation and had previously sought PCRA relief on that basis; (2) Ambrose failed to satisfy the governmental interference exception, as he presented no evidence that the government interfered with his ability to access the information and had never requested the information; (3) Ambrose failed to establish due diligence, as he had been aware of Pitts' misconduct since Johnson testified at trial; and (4) even if Ambrose's claim could be considered timely, he failed to demonstrate how evidence of Pitts' misconduct was material to his guilt, given that it would not have undermined Morton's identification testimony. *See* Rule 907 Notice, 8/11/22, at 2-4.

Ambrose did not file a response to the Rule 907 notice and, on September 15, 2022, the PCRA court dismissed the petition. Ambrose filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. He raises the following claims for our review:

---

failed to disclose material misconduct committed by Pitts in Cunningham's case and in other matters. *See* Amended PCRA Petition, 8/4/22, at Exhibit A (Commonwealth's Answer to Cunningham's Second Amended PCRA Petition).

1.    Did the PCRA court err in finding that the governmental interference exception to the time[ ]bar in the form of a **Brady** violation did not apply to [Ambrose's] amended petition?

2.  Did the PCRA court further err when it dismissed [Ambrose's] amended PCRA petition on the basis that he had no established that he would be entitled to substantive relief because materiality had not been established?

Brief of Appellant, at 2 (unnecessary capitalization omitted).

Before we reach the merits of Ambrose's claims, we must address whether this PCRA petition was timely filed.  It is well-established that "the PCRA's timeliness requirements are jurisdictional in nature and must be strictly construed; courts may not address the merits of the issues raised in a petition if it is not timely filed." **Commonwealth v. Walters**, 135 A.3d 589, 591 (Pa. Super. 2016) (citations omitted).  Generally, a PCRA petition "including a second or subsequent petition, shall be filed within one year of the date the judgment of sentence becomes final." 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence becomes final at the conclusion of direct review or the expiration of the time for seeking the review. **See id.** at § 9545(b)(3).

However, Pennsylvania courts may consider the merits of an untimely PCRA petition if the petitioner explicitly pleads and proves one of the three exceptions enumerated in section 9545(b)(1), which are:  (1) the petitioner's inability to raise a claim as a result of governmental interference; (2) the discovery of previously unknown facts or evidence that would have supported a claim; or (3) a newly-recognized constitutional right that has been held to apply retroactively by the Supreme Court of the United States or the Supreme Court of Pennsylvania. **See id.** at § 9545(b)(1)(i)-(iii).  A petition invoking

an exception under section 9545(b)(1) must be filed within one year of the date the claim could have been presented. **See id.** at § 9545(b)(2).

Here, Ambrose's judgment of sentence became final on January 3, 2014, when the thirty-day period for seeking discretionary review in our Supreme Court expired. **See** 42 Pa.C.S.A. § 9545(b)(3). Thus, Ambrose had until January 3, 2015, to file a timely PCRA petition. Ambrose's instant petition, filed on May 16, 2022, is facially untimely and, thus, Ambrose must satisfy one of the PCRA timeliness exceptions to establish jurisdiction.

Ambrose attempts to invoke the governmental interference exception, asserting that the Commonwealth's failed to disclose the **Brady** material regarding Pitts. Ambrose claims that he learned of this information in March 2022 and filed his petition raising the claim within one year, on May 16, 2022. He argues that:

> [T]he [PCRA] court's position that the government never interfered with [Ambrose's] access to former detective Pitts' Internal Affairs files is directly undermined by its next sentence that "[a] petitioner is not entitled to a police officer's [IA] file, since it is a part of the officer's personnel file. **Commonwealth v. McFalls**, 251 A.3d 1286, 1291 (Pa. Super. 2021) [] (citing **Commonwealth v. Meja-Arias**, 734 A.2d 870 (Pa. Super. 1999)." [PCRA Court Opinion, 9/15/22, at 6.]
>
> Indeed, it is true that criminal defendants are not entitled to police officers' IA files. Consequently, criminal defendants, like [Ambrose], have no ability to "access this information." Thus, the [PCRA] court's observation that [Ambrose] "never requested" this information is a red herring. What good would it have done for [Ambrose], at the time of his trial in 2012, to request or subpoena these files? None, *because he is not entitled to them*. Consequently, the only way for [Ambrose] to receive former

detective Pitts' IA files would have been for the Commonwealth to furnish them to the defense. This has never been done.

Brief of Appellant, at 14-15.

Our Supreme Court has provided that, in order to establish a *Brady* violation:

> a defendant must show that: (1) evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence was favorable to the defendant, either because it was exculpatory or because it could have been used for impeachment; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. However, the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense. Rather, evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Willis*, 46 A.3d 648, 656 (Pa. 2012) (internal citations and quotation marks omitted). "[T]o be entitled to a new trial for failure to disclose evidence affecting a witness' credibility, the defendant must demonstrate that the reliability of the witness may well be determinative of his guilt or innocence." *Commonwealth v. Dennis*, 17 A.3d 297, 308-09 (Pa. Super. 2011).

> Although a *Brady* violation may fall within the governmental interference exception, the petitioner must plead and prove the failure to previously raise the claim was the result of interference by government officials, and the information could not have been obtained earlier with the exercise of due diligence. Section 9545(b)(1)(ii)'s exception requires the facts upon which the *Brady* claim is predicated were not previously known to the petitioner and could not have been ascertained through due diligence. In [*Commonwealth v.*] *Bennett*, [930 A.2d 1264 (Pa. 2007),] we clarified that § 9454(b)(1)(ii)'s exception does not

contain the same requirements as a **Brady** claim, noting "we made clear the exception set forth in subsection (b)(1)(ii) does not require any merits analysis of the underlying claim. Rather, the exception merely requires that the 'facts' upon which such a claim is predicated must not have been known to appellant, nor could they have been ascertained by due diligence." **Bennett**, [930 A.2d] at 1271.

**Commonwealth v. Abu-Jamal**, 941 A.2d 1263, 1268 (Pa. 2008) (some citations omitted).

Here, even assuming, *arguendo*, that Ambrose satisfied the governmental interference exception to the PCRA time bar, he would be unable to establish a substantive **Brady** violation, as he cannot demonstrate the materiality of the evidence, i.e., that its omission resulted in prejudice to him. **Willis**, **supra**. Ambrose claims that "the evidence implicating [Ambrose] was weak, at best," Morton's "identification of [Ambrose] was highly suspect," and "Johnson's recantation of the details [in the statement purportedly coerced by Pitts] pertaining to Morton's 'eyes [getting] wide' and her saying that she'd 'never forget that face' was a crucial point." Brief of Appellant, at 22. These claims are unsupported by the record. As the PCRA court correctly noted, Johnson's testimony was "limited to what happened at the vigil after the murder occurred. Other witnesses testified about what happened at the vigil, including [] Morton. Even if the jury believed [] Johnson's recantation, her testimony did not negate the circumstances of [] Morton's identification of [Ambrose's] Facebook photograph at the vigil." PCRA Court Opinion, 9/15/22, at 8.

- 10 -

Our review of the record further confirms the court's conclusions that, contrary to being "highly suspect," Brief of Appellant, at 22, Morton's identification was based on an "ample opportunity, in close proximity, to observe [Ambrose]." PCRA Court Opinion, 6/26/15, at 8. Rather than giving a "vague" description, Brief of Appellant, at 3, Morton provided a highly detailed description of the shooter, in which she correctly described his clothing, approximate height and weight, complexion, age, build, and hairstyle. *See* N.T. Trial, 12/4/12, at 132-34. Morton testified at trial that she was "certain" that the individual in the Facebook photograph she saw on the night of the vigil was the same person who shot the victim and stated that her reaction to being shown the image was: "Oh, my God. Yes." *Id.* at 146-47. Morton never wavered in her identification of Ambrose, and she identified him on no fewer than five separate occasions: (1) at the vigil on the day of the shooting, *see id.* at 146; (2) six months after the shooting, on January 24, 2011, when shown a photo array[4] by police, *see id.* at 153; (3) later on January 24, 2011, when shown a Facebook photo of Ambrose by police, *see id.* at 156; (4) at Ambrose's preliminary hearing, *see id.* at 158, and (5) at trial. *See id.* at 120.

---

[4] Ambrose claims that the photo array shown to Morton was "suggestive" because, while Ambrose was wearing "civilian clothes, . . . every other subject wore a white t-shirt[.]" Brief of Appellant, at 4. This assertion is belied by the record. At trial, the jury was shown the photo array; of the seven other individuals pictured in the array, two were described for the record as wearing white shirts, three as wearing black shirts, one as wearing no shirt, and one as wearing a light blue shirt. *See* N.T. Trial, 12/6/12, at 52-53.

In the face of Morton's clear, unwavering, and accurate identification of Ambrose, the purportedly false statement attributed to Johnson in the statement taken by former detective Pitts—that Morton's "eyes got wide" when she saw the Facebook photo at the vigil and she stated she would "never forget [Ambrose's] face"—simply cannot be deemed material to Ambrose's guilt. Indeed, Morton's own testimony as to her reaction upon first seeing the Facebook photo of Ambrose—"Oh my God. Yes."—conveys the same level of certainty as the statement attributed to her in Johnson's allegedly false statement.

In light of the foregoing, Ambrose is unable to demonstrate that the omission of evidence pertaining to misconduct engaged in by former detective Pitts prejudiced him. Ambrose's conviction was based on Morton's eyewitness identification testimony. Accordingly, evidence tending to undermine the credibility of Pitts—who neither interviewed Morton nor showed her the photo array—would not have made a difference in the outcome of trial. Likewise, even if Ambrose could have conclusively demonstrated that Johnson's statement had been coerced by Pitts, there is no reasonable probability that the result of the proceedings would have been different. Accordingly, we affirm the order of the PCRA court.

Order affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 9/21/2023*